

JESSE A. BUSS
411 FIFTH STREET
OREGON CITY, OR 97045
WWW.WLGpnw.COM

PH 503-656-4884
FAX 503-608-4100
JESSE@WLGpnw.COM

**WILLAMETTE**

—— L A W  G R O U P ——

*For People & the Places They Love*

August 14, 2020

City of Oregon City
Kattie Riggs, City Recorder & Elections Official
625 Center St.
Oregon City OR 97045
*recorder@orcity.org*

      RE:    Petition 2020-01 (Recall of Mayor Dan Holladay); 90-day limit on recall
               signature gathering violates Or. Const, Art. II, § 18 and the First Amendment.

Dear Ms. Riggs:

    As you know, I represent Jeana Gonzales in her capacity as chief petitioner of the mayoral recall campaign. I also represent Adam Marl, an Oregon City elector and Ms. Gonzales' agent (*see* previously filed form SEL 307), as well as the Committee to Recall Dan Holladay, which is registered with the Oregon Secretary of State as the campaign committee for Petition 2020-01.

    This letter concerns the timeframe applicable to the recall campaign's signature-gathering efforts. Specifically, this letter explains the campaign's position that the statutory 90-day signature gathering deadline violates Article II, section 18 of the Oregon Constitution, as well as the First Amendment to the U.S. Constitution.

### Introduction

    Like the City Commission, as reflected by its unanimous votes of no confidence and censure, the recall campaign recognizes that the people of Oregon City have lost faith in Mayor Holladay, that he now lacks the ability to lead effectively, and that he should resign. But unlike the City Commission, the campaign has the tools necessary to bring that issue to the voters in a special recall election. Having spoken with numerous campaign volunteers, I can say there is a prevailing sense of purpose and responsibility rooted not just in duty to the community as a whole, but also in duty to the City Commission itself. There is widespread recognition that Mayor Holladay is not only damaging our town's reputation, but that his presence on the

1

Exhibit 4 - Page 1 of 16

Commission is directly impeding its work. The campaign is proud to serve the Commission in working to remove that impediment, with the hope that the Commission can soon get back to focusing on important policy matters.

While the recall campaign is currently on track to reach its goal of 3,100 raw signatures[1] within the 90-day period that expires September 21st, success in achieving that goal is not guaranteed. From the campaign's start, the challenges associated with the ongoing COVID-19 pandemic have been substantial. Traditionally, signature gathering campaigns have heavily relied on large public gatherings and door-to-door canvassing to engage potential signers, but the restrictions and responsible safety protocols associated with COVID-19 have effectively taken those options off the table for now, with no end in sight.

Because the COVID-19 pandemic has been the backdrop for this entire recall effort, the campaign has largely relied on the following creative signature-gathering solutions:

- Online pre-registration for signing, with options to:
  - Schedule personal outdoor signing appointments; or
  - Have signature sheets delivered to a voter's home, or mailed/emailed to the voter.
- Outdoor drive-through signing stations;
- Web-based printable electronic signature sheets ("e-sheets");
- Physically distanced presence at the Oregon City Farmers Market and other organized outdoor public events that comply with physical distancing requirements; and
- Intense volunteer recruitment to activate existing small networks (*e.g.* intra-household and neighbor-to-neighbor engagement).

The campaign is also preparing to send a large batch mailer to registered Oregon City voters, with each envelope containing a cover letter, signature sheet, instructions for gathering signatures, and a postage-prepaid return envelope. This technique has proved effective for other signature-gathering campaigns during COVID-19.

These creative solutions, while effective, are inefficient when compared to traditional signature gathering strategies. For example, it takes a large investment of volunteer time and energy just to schedule and plan for individual outdoor signing appointments, not to mention the travel time and the time actually spent obtaining signatures at each appointment. In contrast to traditional signature gathering campaigns, the COVID-19 reality for this recall campaign is that each signature obtained represents special attention, careful planning, and a large block of time. So, while there is broad public support for the recall effort, without a doubt COVID-19 has slowed the normal pace of signature gathering.

---

[1]     The goal of 3,100 raw signatures is 700 more than the required 2,400 verified signatures, to account for a typical signature invalidity rate.

Exhibit 4 - Page 2 of 16

Based on the levels of public support the campaign is seeing, there is little doubt that, during non-COVID-19 times, the campaign could easily obtain well over 2,400 valid signatures during the statutory 90-day signature gathering period. And, as mentioned above, the campaign is currently on track to meet its signature goal. But there is mounting uncertainty because of COVID-19. As the case count continues to climb in Oregon, some counties are moving from Phase 2 back to Phase 1 or even to baseline stay-at-home conditions, and there is no way to know how virus conditions will change in Clackamas County and Oregon City between now and September 21st, when the statutory 90-day period expires. Will Clackamas County's virus situation worsen or improve? Will we move into Phase 2, stay in Phase 1, or move back to baseline stay-at-home conditions? Will people feel comfortable leaving their homes and interacting with strangers carrying political petitions? Because nobody knows how Clackamas County will fare over the next six weeks, the campaign is planning for the worst. And planning for the worst means assuming that the campaign will *not* obtain 2,400 valid signatures by September 21st.

Because of COVID-19, candidate, initiative, referendum, and recall campaigns throughout the country are encountering unprecedented problems obtaining enough signatures to qualify for the ballot. As a result, many states' signature requirements are receiving intense judicial scrutiny. Oregon is no exception. *See, e.g., People Not Politicians v. Clarno*, No. 6:20-cv-01053-MC (D. Oregon) (challenging statewide initiative signature requirement and submission deadline for IP-57). Regardless of the state or the specific law being debated, the ultimate question is the same: how do we preserve the peoples' petition rights during a global pandemic? By bringing that question to the forefront, COVID-19 has created a national maelstrom of election-related litigation that will likely continue for years.

Which brings me to the purpose of this letter. As you know, Ms. Riggs, for the recall campaign you have established a signature gathering deadline of September 21st, with a minimum signature threshold of 2,400. Per my telephone conversations with you in June and our recent email correspondence, you relied on the Oregon Secretary of State's 2020 Recall Manual in determining those standards. And, in all fairness, as Oregon City's Elections Official you should expect to be able to rely on the Recall Manual. Unfortunately, the Recall Manual does not accurately reflect Oregon law.

As explained below, the 90-day deadline contained in ORS 249.875(1) unlawfully constricts the recall right granted by Article II, section 18 of the Oregon Constitution, and is therefore facially void. Because you have a direct constitutional duty to call a special recall election when the constitutional prerequisites have been met, the recall campaign requests that you recognize the invalidity of the statutory 90-day limitation and revoke your prior order that recall petition signatures are due on September 21, 2020.

The 90-day limit is also facially void under the First Amendment, and void as applied under both Article II, section 18 and the First Amendment. The campaign requests that you acknowledge those deficiencies and implement appropriate mitigation, as outlined below.

3

Exhibit 4 - Page 3 of 16

## I.    The Recall Right - Or. Const, Art. II, § 18

Adopted via initiative in 1908, Oregon's recall right is contained in Article II, section 18 of the Oregon Constitution, which states in full as follows:

<u>Section 18. Recall; meaning of words "the legislative assembly shall provide."</u>

(1) Every public officer in Oregon is subject, as herein provided, to recall by the electors of the state or of the electoral district from which the public officer is elected.

(2) Fifteen per cent, but not more, of the number of electors who voted for Governor in the officer's electoral district at the most recent election at which a candidate for Governor was elected to a full term, may be required to file their petition demanding the officer's recall by the people.

(3) They shall set forth in the petition the reasons for the demand.

(4) If the public officer offers to resign, the resignation shall be accepted and take effect on the day it is offered, and the vacancy shall be filled as may be provided by law. If the public officer does not resign within five days after the petition is filed, a special election shall be ordered to be held within 35 days in the electoral district to determine whether the people will recall the officer.

(5) On the ballot at the election shall be printed in not more than 200 words the reasons for demanding the recall of the officer as set forth in the recall petition, and, in not more than 200 words, the officer's justification of the officer's course in office. The officer shall continue to perform the duties of office until the result of the special election is officially declared. If an officer is recalled from any public office the vacancy shall be filled immediately in the manner provided by law for filling a vacancy in that office arising from any other cause.

(6) The recall petition shall be filed with the officer with whom a petition for nomination to such office should be filed, and the same officer shall order the special election when it is required. No such petition shall be circulated against any officer until the officer has actually held the office six months, save and except that it may be filed against a senator or representative in the legislative assembly at any time after five days from the beginning of the first session after the election of the senator or representative.

(7) After one such petition and special election, no further recall petition shall be filed against the same officer during the term for which the officer was elected unless such further petitioners first pay into the public treasury which has paid such special election expenses, the whole amount of its expenses for the preceding special election.

4

Exhibit 4 - Page 4 of 16

(8) Such additional legislation as may aid the operation of this section shall be provided by the legislative assembly, including provision for payment by the public treasury of the reasonable special election campaign expenses of such officer. But the words, "the legislative assembly shall provide," or any similar or equivalent words in this constitution or any amendment thereto, shall not be construed to grant to the legislative assembly any exclusive power of lawmaking nor in any way to limit the initiative and referendum powers reserved by the people."

The portions of section 18 addressing time limitations and signature thresholds are discussed below.

**A.      The applicable time limitation for signature gathering is the elected official's remaining time in office.**

Notably, section 18 contains no express or implied time limitation on signature gathering. Considering how many other time limits are included in section 18, the absence of a time limit for signature gathering is conspicuous. Those other prescribed time limits include the following:

1.  The five-day resignation period of subsection (4);
2.  The 35-day election deadline of subsection (4);
3.  The general six-month waiting period of subsection (6); and
4.  The five-day waiting period specific to members of the legislative assembly provided by subsection (6).

Other than the above, the only portion of section 18 that mentions a period of time is subsection (7), which implicitly suggests that signature gathering must occur during "the term for which the officer [subject to the recall effort] was elected." Section 18 therefore contains no signature gathering time limitation, except for the obvious and implicit requirement that signatures be gathered during the elected official's term of office.

Nor does section 18 authorize the legislative assembly to establish a time limitation for signature gathering that is shorter than an elected official's remaining time in office. Although subsection (8) authorizes the Oregon Legislature to enact statutes "as may aid the operation of this section," the Oregon Supreme Court has interpreted the word "aid" in section 18 to mean "to support, help, or assist." *State ex rel. Clark v. Harris,* 74 Or 573, 580 (1914). A statutory signature gathering time limitation would not "support, help, or assist" the operation of section 18. Instead, such a statutory time limit would impermissibly curtail and burden section 18's self-executing recall power. *See Harris,* 74 Or at 585 (section 18 is self-executing and requires no implementing legislation).[2]

_____

[2]      No legislation related to the recall power was passed until 25 years after section 18 was adopted. 1933 c. 381 § 2.

5

Exhibit 4 - Page 5 of 16

**B.      The maximum and default signature threshold is 15%.**

Subsection 18(2) imposes a ceiling on how many signatures recall petitioners may be required to file in order to trigger a special recall election. That maximum threshold is 15% of the number of electors who voted for Governor in the electoral district at the most recent election at which a candidate for Governor was elected to a full term. *Id.* Section 18 does not specify a minimum threshold for signatures.[3]

The Oregon Supreme Court has held that, in the absence of legislation or a municipal charter provision electing a lower percentage threshold for recalls, the maximum percentage threshold applies. *See Harris*, 74 Or at 579-80 (applying maximum percentage threshold of 25 percent under original version of Article II, section 18); *State ex rel. Postlethwait v. Clark*, 143 Or 482, 488 (1933) (looking first to the charter of the City of Baker in evaluating applicable recall procedure). Therefore, in the absence of an applicable local or statewide downward election, the default signature threshold for recalls is 15%. The Oregon Legislature has elected the 15% maximum, *see* ORS 249.870, while Oregon City has not made an affirmative election, and therefore defaults to the 15% threshold.

## II.      The Invalid 90-Day Limitation - ORS 249.875(1)

As part of the 1933 recall legislation package, the legislative assembly adopted the 90-day signature gathering limitation as part of what became *former* O.C.L.A. 81-2202. That statute was renumbered as *former* ORS 254.420 in 1953, and became ORS 249.875(1) in 1979.

The current statute, ORS 249.875(1), reads as follows:

"A recall petition shall be void unless completed and filed not later than the 100th day after filing the prospective petition described in ORS 249.865. **Not later than the 90th day after filing the prospective petition the petition shall be submitted to the filing officer** who shall verify the signatures not later than the 10th day after the submission. The filed petition shall contain only original signatures. A recall petition shall not be accepted for signature verification if it contains less than 100 percent of the required number of signatures. The petition shall not be accepted for filing until 100 percent of the required number of signatures of electors have been verified."

---

[3]      The signature threshold flexibility for recalls that is built into subsection 18(2) contrasts with the statewide initiative and referendum, which have fixed percentage signature thresholds. Initiatives seeking to adopt or amend statutes are subject to a six percent threshold, while initiatives seeking to amend the Oregon Constitution are subject to an eight percent threshold. Or. Const, Art. IV, §§ 1(2)(b)-(c). Similarly, statewide referenda are subject to a fixed 4% signature threshold. Or. Const, Art. IV, § 1(3)(b). However, like the recall, municipal initiatives and referenda are subject to percentage threshold ceilings; municipal initiatives are capped at 15% of qualified voters, and municipal referenda are capped at 10% of qualified voters. Or. Const., Art. IV, § 1(5).

Exhibit 4 - Page 6 of 16

*Id.* (bolding added).

As discussed below, ORS 249.875(1) does not apply to recall petitions in Oregon City. But in any event, the statute is void and unenforceable because it unconstitutionally burdens the recall right of Article II, section 18.

**A.      ORS 249.875(1) does not apply to Oregon City, a home rule municipality.**

ORS 249.875(1) was adopted by the Oregon Legislature and applies to statewide recall petitions. It does not apply to home rule cities like Oregon City, which derive their recall powers directly from Article II, section 18.

First, nothing in ORS 249.875(1) purports to make its provisions applicable to cities. This contrasts with the statutory scheme governing the initiative and referendum, which expressly states that it *does* apply to cities "unless the city charter or ordinance provides otherwise." ORS 250.255. There is no similar statutory language purporting to make the recall statutes applicable to cities.

Second, because Article II, section 18 is self-executing under *Harris,* 74 Or at 585, Oregon City electors have full access to the recall power without any need for or reference to state statute. *See id.* at 584 ("There is nothing in [section 18] indicating an intention that the right of recall should be dependent upon the action or will of the Legislature."). In the absence of an enabling/dependent relationship between ORS 249.875(1) and Oregon City's recall power, there is no reason to impose the former's 90-day restriction on the latter.

And third, even if the Legislature *did* intend the 90-day limitation of ORS 249.875(1) to apply to cities, that limitation would be void as conflicting with Oregon City's home-rule authority to draft and amend its own charter, free of interference from the Oregon Legislature. Article XI, section 2 of the Oregon Constitution, known as the "home rule amendment," provides in part:

> "The Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the state of Oregon[.]"

The Oregon City Charter takes maximum advantage of the home rule amendment. For example, Chapter II, section 4 of the Charter states that "[t]he city shall have all powers which the constitutions, statutes, and common law of the United States and of this state expressly or impliedly grant or allow municipalities, as fully as though this charter specifically enumerated each of those powers." And if there was any remaining doubt, Chapter II, section 5 drives home the point: "The charter shall be liberally construed to the end that the city may have all powers necessary or convenient for the conduct of its municipal affairs, including all powers that cities may assume pursuant to state laws and to the municipal home rule provisions of the state

7

Exhibit 4 - Page 7 of 16

constitution." Because the recall power is a "power which the constitution...of this state expressly or impliedly grants or allows municipalities," the Oregon City Charter itself effectively contains the recall power "as though...specifically enumerated" therein. Or. City Charter, Ch. II, §4. The Legislature therefore cannot impose the 90-day limitation of ORS 249.875(1) on Oregon City, as doing so would "amend or repeal" part of the Oregon City Charter in contravention of the home rule amendment. Or. Const, Art. XI, § 2.

Other than adopting the Article II, section 18 recall power directly into its charter, Oregon City law does not address the recall power. Oregon City hasn't developed its own custom recall petition regulations, nor it has not adopted the statutory recall scheme, which some other cities have done. For example, the City of Portland has a charter provision that adopts the statutory recall scheme: "The initiative, referendum *and recall* shall be exercised within the City of Portland in the manner provided by the Constitution *and general laws of the State*, and ordinances of the City of Portland, enacted in pursuance thereof." Portland Charter, Ch. 3, Art. 2, § 3-201 (emphasis added). Oregon City has no similar provision. The closest it comes is a provision that says "the general laws of the state shall apply to the conduct of all city elections, recounts of the returns therefrom, and contests thereof. Or. City Charter, Ch. VI, § 26. But a recall petition does not involve "the conduct of a city election," so section 26 does not apply. A recall petition drive is a separate and distinct thing from an election; a recall *election* only occurs if the proponents of a recall *petition* drive obtain enough signatures to trigger an election. *See* Or. Const., Art. II, § 18(6) (the filing officer shall order a special election only "when it is required" after filing of a completed recall petition, and not before). If a recall petition drive fails to obtain enough qualifying signatures, then no election will be triggered. A recall petition therefore does not implicate section 26 of the Oregon City Charter, and the general laws of Oregon, including the 90-day limitation of ORS 249.875(1), do not apply to Oregon City recall petition drives.

As discussed above, ORS 249.875(1) does not apply to Oregon City. Next, I'll explain why that statute is void as inconsistent with the recall right, regardless of where it's applied.

### B.    Article II, section 18(8) does not authorize the Legislature to impose a time limit for signature gathering.

Even if the 90-day signature gathering time limit of ORS 249.875(1) somehow applies to Oregon City, that limitation is void and unenforceable because it unconstitutionally burdens the recall right of Article II, section 18.

As far as I can tell, and surprisingly, the constitutionality of the statutory 90-day signature gathering limitation has never been addressed by an Oregon appellate court. But the issue has been raised in a formal opinion of the Oregon Attorney General, wherein Representative and Majority Leader Ed Lindquist presented the following question: "Is the provision of [ORS 249.875(1)], which renders void recall petitions which are not filed on or before the 90th day after filing of the original registration petition provided for in [ORS 249.865], unconstitutional under Oregon Constitution, Article II, § 18?" 37 Op. Atty Gen. Ore. 1399 (1976). In a superficial

8

Exhibit 4 - Page 8 of 16

opinion filled with bluster, Attorney General Lee Johnson answered "No," *id.,* reasoning that subsection 18(8) provides the Legislature with authority to impose the 90-day limitation:

> "There is no question that the Oregon legislature may constitutionally enact laws which procedurally define and help to implement the people's constitutional powers of recall, initiative, and referendum. Article II, § 18, of the Oregon Constitution, as noted, expressly mandates that 'such additional legislation as may aid the operation of this [recall] section shall be provided by the legislative assembly . . .', and the ability of the legislature to enact reasonable procedures by which voters may exercise their powers of recall, initiative, and referendum cannot be seriously challenged.
> ....
>
> "Specifically, the provision in [ORS 249.875(1)] that recall petitions shall be void unless completed and filed within 90 days of the original filing is an unquestionably constitutional requirement."

37 Op. Atty Gen. Ore. at 1400-1401. That advice was wrong.

The main failing of the 1976 Johnson opinion is that it completely ignored the 1914 *Harris* decision, 74 Or 573, which should have controlled the analysis. In *Harris*, decided six years after the recall power was added to the Oregon Constitution, the Court was called upon to decide whether the recall power of Article II, section 18 is self-executing, or whether it instead requires implementing legislation. *Id.* at 575-76. The Court did not mince words in finding the recall power to be entirely self-executing:

> "[Article II, section 18] subjects every state, district, county, and municipal officer to what has been designated as the 'Imperial Recall.' It provides a special remedy to oust from public office a corrupt, incompetent, unfaithful, or unpopular public servant.
> ....
>
>> "'Such additional legislation *as may aid the operation of this section* shall be provided by the legislative assembly, including provision for payment by the public treasury of the reasonable special election campaign expenses of such officer.'
>
> "This clause requires the legislative assembly to pass such legislation 'as may *aid* the operation' of said section. This does not mean legislation to put said section in operation, but such as will *aid* its operation. It seems to imply that the section will be in operation before such legislation shall be enacted. 'To aid' signifies 'to support, help, or assist.'

"This section does not confer *power* upon the legislative assembly to provide for the recalling of officers. It is not a mere declaration of principles to be made operative by the legislative assembly. It provides that *'every public officer, is subject as herein provided, to recall.'* Every officer is made, by this section, subject to recall as provided therein and not as the lawmaking department may provide.

....

"[Article II, section 18] sets forth a complete modus operandi for the recall. Nothing whatever is omitted that is necessary to effect the recall. Its provisions are absolute, not conditional. Its terms indicate an intention that it shall be operative as soon as it shall be adopted by the people. *There is nothing to be done by the Legislature to put it in operation.* It is clear from the terms of this section that its framers and the electors who adopted it did not intend that it should be *in abeyance* until the lawmaking power should pass some act in its aid. If they had intended to confer *power* on the Legislature to provide for a recall of public officers, they could have done so in a few words, and it would not have been necessary to use 500 words in conferring this power. It is evident from the wording of this section that its framers and the electors who adopted it desired to make it effective immediately. To make it dependent on the action of the Legislature would have been to make it subject to be defeated by the inaction of an unfriendly or negligent Legislature.

....

"[Subsection 18(8),] which provides that such additional legislation as may aid in the operation of this section shall be provided by the legislative assembly, including a provision for payment, by the public treasury, of the reasonable special election campaign expenses of such an officer, is a direction to the Legislature to pass such act as may aid in the operation of said section, but the right to have an officer recalled, in accordance with the provisions of such sections, is not made *dependent* on the passage of such an act. It is the duty of the legislative assembly to pass such act, but the right to recall an officer cannot be suspended or defeated by the failure of the Legislature to do its duty in the premises. There is nothing in said section indicating an intention that the right of recall should be *dependent* upon the action or will of the Legislature. The people adopted this section to enable them to have a remedy against corrupt, inefficient, unfaithful or unpopular public officers. The section provides a complete code for a recall of officers, and, according to the obvious meaning of the language used, the right was to be effective *as soon as said section took effect."*

"It is hardly necessary for us to say that we have nothing to do with the *wisdom* of the provision for the recall. Obviously, it can be abused."

*Harris*, 74 Or at 579-85 (emphasis in original). The above-quoted portions of *Harris* completely undermine the 1976 Johnson opinion.

10

Exhibit 4 - Page 10 of 16

The Johnson opinion fails to recognize that the Legislature is powerless to curtail the recall right, which springs, fully formed, from section 18 itself. That point was repeatedly explained by the *Harris* court: "Every officer is made, by [section 18], subject to recall as provided therein and not as the lawmaking department may provide. ... [Section 18] sets forth a complete modus operandi for the recall. ... Its provisions are absolute, not conditional. ... There is nothing in [section 18] indicating an intention that the right of recall should be dependent upon the action or will of the Legislature." 74 Or at 580-81, 584. Equally clear is that the Legislature's only function in the recall context is to enact legislation that will "aid" section 18. *Id.* at 580.

The *Harris* court explained that "'To aid' signifies 'to support, help, or assist.'" *Id.* So, the question is, does the 90-day signature gathering limitation contained in ORS 249.875(1) "support, help, or assist" the operation of Article II, section 18? No, it doesn't. Logic demands that to "support, help, or assist" the operation of section 18, a recall-related statute must, first, serve at least one provision of section 18 and, second, it must not unduly burden any other provision. The 90-day signature gathering limitation of ORS 249.875(1) fails that test on both counts.

First, the 90-day limitation does not serve any provision of section 18. Most obviously, nowhere does section 18 permit the imposition of a signature gathering deadline. Neither does it serve any of the other provisions of section 18, listed as follows:

1.    The maximum 15% signature threshold of § 18(2);
2.    The petition content requirement of § 18(3);
3.    The resignation and special election provisions of § 18(4);
4.    The 200-word and vacancy provisions of § 18(5);
5.    The procedural requirements of § 18(6); and
6.    The expense reimbursement provision of § 18(7).

Because it doesn't serve any provision of section 18, the statutory 90-day signature gathering limitation is void.

Aggravating the problem, the 90-day limitation unduly burdens several provisions of section 18. Because the recall power is a fundamental constitutional right, strict scrutiny applies. Analyzed under strict scrutiny, a statute unduly burdens a constitutional right unless the statute is justified by a compelling state interest and the statute is narrowly tailored to achieve that interest. Here, the 90-day limitation is not justified by a compelling state interest and, in any event, it is not narrowly tailored.

The burden on the core recall power of subsection 18(1) is of primary concern. That subsections reads: "Every public officer in Oregon is subject, as herein provided, to recall by the electors of the state or of the electoral district from which the public officer is elected." The statutory 90-day limitation burdens that right because it compresses the time within which a recall petitioner can gather signatures to trigger a recall election, making it more difficult to exercise the right conferred by subsection 18(1). The state has no compelling interest in this draconian limitation.

Exhibit 4 - Page 11 of 16

The *only* interest served by the 90-day limitation is to curtail the recall right. Even Attorney General Johnson admitted as much in his 1976 defense of the time limit:

> "The abuse that [the 90-day limitation] was designed to prevent was feared soon after passage of Article II, § 18. The substance of that fear is related in J.D. Barnett, <u>Operation of Initiative, Referendum, and Recall in Oregon</u>, p. 211 (1915):
>
> "'It is possible that a recall petition, based upon good grounds or not, may be circulated, and then when completed or nearly completed, be put in 'cold storage' to await a more convenient opportunity for a sudden assault upon the officer involved. And, whether or not the petition were originally circulated with this end in view, there are cases in which the uncertainty of the officer's position has been thus continued for a considerable period of time. 'A plan of securing petitions and holding them indefinitely, to be filed at the whim of a few wire pullers, is absurd. Such a program could be employed to bully and control officials. No little group of men should be permitted to hold such petitions in their hands, to be used as a means of influencing affairs at the city hall. No more dangerous program could be introduced into municipal or other government. Recall petitions should be filed and an election be brought when sufficient names are secured, or they should be destroyed. [...]' (Quoting from <u>Oregon Journal</u>, May 10, 1914, § 2, p4, col 1)."

37 Op. Atty Gen. Ore. at 1402. But curtailing the recall right simply because the Legislative Assembly doesn't like its constitutional scope is not a compelling reason. There is no evidence that, in the 25 years before the 90-day limit was adopted, there were ever any completed or near-completed recall petitions kept in "cold storage" for later use. And even if such abuse occurred, it wouldn't justify the direct curtailment of the recall right. As the *Harris* court observed of the recall power in 1914: "Obviously, it can be abused." 74 Or at 585. Much like the First Amendment freedom of speech, the potential for abuse of the recall right is not a compelling reason to burden the right itself.

Even if preventing completed or near-completed recall petitions from being put in "cold storage" reflected a compelling state interest, the 90-day limit is not narrowly tailored to achieve that purpose. Instead, because of its overbreadth, the 90-day limit has created the opposite of the cold storage problem, the *spoilage* problem, which occurs when recall petitioners, despite actively pursuing signatures, fail to obtain sufficient signatures within 90 days. When that happens, which is frequently, the recall petitioners' efforts are wasted, and the signatures gathered count for nothing. It is an inflexible rule; even if the recall campaign only needs one more day, or one more signature, the 90-day limitation operates to preclude a recall election that is otherwise available under Article II, section 18.

There are ways to address the hypothetical cold storage problem without creating the very real spoilage problem. For example, instead of imposing a one-size-fits-all 90-day deadline, legislation could be crafted requiring recall petitioners to actively pursue signatures until they meet the minimum signature threshold, at which time they must immediately submit their signatures for verification. To monitor their progress, recall petitioners could be required to submit monthly sworn status reports regarding their signature-gathering efforts. Such a scheme would ensure that recall petitioners are not sitting on their rights, would avoid the spoilage problem inherent in the 90-day deadline and, critically, would not unduly burden the recall right. In essence, this arrangement would represent a codification of the laches doctrine, specifically applied to the recall right. *See also* 37 Op. Atty Gen. Ore. at 1403 (citing *Cloud v. Dyess*, 172 So 2d 528 (La., 1965): "a recall petition is deemed abandoned by laches when the recall petitioners do not actively pursue their remedy[.]").

For the reasons explained above, the 90-day signature gathering limitation of ORS 249.875(1) unduly burdens the recall right of Article II, section 18, and is therefore void. Next, I discuss why the 90-day limit also violates the First Amendment.

### III.    The 90-day limit facially violates the First Amendment.

Circulating petitions to qualify for the ballot constitutes core political speech protected under the First Amendment. *See Meyer v. Grant*, 486 U.S. 414, 425; *Angle v. Miller*, 673 F3d 1122, 1132 (9th Cir. 2012). Therefore, regulations imposing severe burdens on petition circulators must be narrowly tailored and advance a compelling state interest. *Angle*, 673 F3d at 1132. There are at least two ways in which restrictions on the petition process can severely burden core political speech. *Id.* First, regulations can restrict one-on-one communication between petition circulators and voters. *Id.* Second, regulations can make it less likely that proponents will be able to garner the signatures necessary to qualify for the ballot, thus limiting their ability to make the petition's subject matter the focus of district-wide discussion. *See id.* The 90-day limit of ORS 249.875(1) falls within the latter category.

While there is no First Amendment right to qualify a petition for the ballot, regulations that make it more *difficult* to qualify for the ballot indirectly impact core political speech by reducing the total quantum of speech on a public issue. *Angle*, 673 F3d at 1133. Thus, as applied to petitions, courts assume that ballot access restrictions place a severe burden on core political speech, and trigger strict scrutiny, when they significantly inhibit the ability of petition proponents to qualify for the ballot. *Id.*

The 90-day limitation of ORS 249.875(1) is subject to strict scrutiny under that test. As explained elsewhere in this letter, the Oregon Constitution contains no time limit for gathering recall petition signatures, except for the implicit requirement that signatures may only be gathered during the targeted elected official's term of office. *See* Or. Const., § 18(7). So under section 18, a recall petition may be circulated for nearly four years. But under ORS 249.875(1), a recall petition may be circulated for only 90 days. By definition, therefore, the 90-day limit on signature gathering makes it significantly less likely that recall proponents will be able to garner the signatures necessary to qualify for the ballot, thus triggering strict scrutiny under *Angle*. 673 F3d at 1133.

13

Exhibit 4 - Page 13 of 16

The statute cannot withstand strict scrutiny. Although I won't repeat the discussion here, as explained in a previous section of this letter, the 90-day limitation is not narrowly tailored to advance a compelling state interest. It is therefore facially void as infringing on core political First Amendment rights.

**IV.    As applied during the COVID-19 pandemic, the 90-day limitation is void.**

As the world struggles to contain the COVID-19 pandemic, petition circulators in the United States are facing unprecedented difficulties in gathering enough signatures to qualify for the ballot. Because of COVID-19, much of the population is on lock-down, large events have been cancelled, and door-to-door canvassing is either impractical or impossible. So, unsurprisingly, courts around the country are facing as-applied challenges to petition deadlines, minimum signature thresholds, and related disputes. Ultimately, those courts are confronted with the question of how to preserve meaningful First Amendment and state-based petition rights while the traditional means of signature gathering are either unavailable or fraught with peril.

A recent example in Oregon is the IP-57 campaign's as-applied challenge to the signature submission deadline and minimum signature threshold for statewide constitutional amendment initiatives. *See People Not Politicians v. Clarno*, No. 6:20-cv-01053-MC (D. Oregon). Applying the *Angle* framework, the district court found that, at least during the COVID-19 crisis, the challenged deadline and signature threshold violated the First Amendment. *See id.*, Opinion and Order (July 13, 2020), *stayed pending appeal*, 591 U.S. _____ (Aug. 11, 2020). In so holding, the court relied on the fact that the campaign had acted with reasonable diligence in pursuing signature gathering, such that they would have qualified for the ballot but-for the COVID-19 emergency. *Id.* at 9-10. In fashioning appropriate relief, the court reduced the minimum signature threshold by more than 50% and allowed the petitioners an additional six weeks to obtain sufficient signatures. *Id.* at 13-14.

The practical challenges presented by COVID-19 are the same for the recall campaign as they were for the IP-57 campaign; the traditional methods of signature gathering are nearly worthless during the pandemic. As explained at the beginning of this letter, the recall campaign has pivoted to creative and untraditional methods of signature gathering, but those methods are relatively time consuming, expensive, and inefficient. The result is that, under *Angle*, the 90-day limitation of ORS 249.875(1) is void as applied during COVID-19 because it significantly inhibits the chances of qualifying for the ballot.

For the same reason, the statute is also void as applied under the Oregon Constitution. As explained elsewhere in this letter, the 90-day limitation regularly causes spoilage even in normal, non-COVID-19 circumstances; 90 days simply isn't enough time for reasonably diligent recall petitioners to gather enough signatures to qualify for the ballot. But the situation is much worse during COVID-19. Despite broad public support for the recall effort and creative, hyper-diligent efforts by the campaign, the 90-day deadline unduly burdens the recall right under Article II, section 18, as applied during the pandemic.

Exhibit 4 - Page 14 of 16

## V.      Remedy

Ms. Riggs, as Oregon City's filing officer under Article II, section 18, you have a direct constitutional duty to "order the special [recall] election when it is required." *Id.* at 18(6). As a necessary corollary, you have a duty to determine *when* a special recall election is required under the Oregon Constitution. Sometimes, including now, that means scrutinizing statutes for constitutionality through the filter of Article II, section 18.

As explained in this letter, the 90-day limit of ORS 249.875(1) is void facially and as applied under both Article II, section 18 of the Oregon Constitution and the First Amendment to the U.S. Constitution. Because you have the duty and authority to order the election when it's required, it falls to you in the first instance to resolve these issues of law. In other words, the campaign needs you to determine whether you will enforce the 90-day statutory limitation, or if you will instead recognize its invalidity in light of Article II, section 18, the First Amendment, and COVID-19.

Assuming you agree that the 90-day limit is facially inconsistent with the Oregon Constitution or the First Amendment, the relief is simple: you need only declare that the 90-day limit is invalid and that you do not intend to enforce it against the campaign. This would relieve the campaign of the 90-day limit and the campaign will continue gathering signatures until it has enough to qualify for the ballot under the default minimum signature threshold, namely: 2,400 (calculated as 15% of the number of votes cast for Governor in Oregon City during the last four-year election).

If you do not agree that the 90-day limit facially violates either the Oregon Constitution or the First Amendment, but you find an *as-applied* violation due to COVID-19, the appropriate relief is tolling the 90-day clock for some justifiable period of time. Although a case could be made for some other tolling period, the most appropriate relief for a pandemic-related as-applied violation is tolling the signature gathering clock for the number of days that Oregon City has been subject to COVID-19 restrictions that hamper traditional in-person signature gathering. You would, however, have discretion in fashioning appropriate as-applied relief.

### Conclusion

Ms. Riggs, for the reasons set forth above, the recall campaign asks you to declare the 90-day signature gathering limitation void as inconsistent with Article II, section 18 of the Oregon Constitution, and the First Amendment to the U.S. Constitution. In the alternative, and in the event you find an as-applied constitutional violation, the campaign asks you to toll the 90-day clock for an appropriate period of time, taking into consideration the barriers to traditional signature gathering posed by the COVID-19 pandemic.

The uncertainty surrounding the application of the 90-day limitation complicates the campaign's decision-making, so a speedy resolution of this matter is necessary to inform the campaign's use of volunteer time, financial resources, and other strategic assets. As such, this request is inherently time sensitive, and the campaign would appreciate a decision on or before Friday, August 21st. If I haven't received a decision document from you by that time, I will assume you are taking no action to relieve the campaign of the 90-day deadline.

Thank you for your time and consideration.

Sincerely,

Jesse A. Buss

cc:    Jeana Gonzales
       Adam Marl

16

Exhibit 4 - Page 16 of 16