JESSE A. BUSS, OSB # 122919
WILLAMETTE LAW GROUP
411 Fifth Street
Oregon City OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

Attorney for Plaintiffs
COMMITTEE TO RECALL DAN HOLLADAY,
JEANA GONZALES, and ADAM MARL

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **COMMITTEE TO RECALL DAN HOLLADAY, JEANA GONZALES,** and **ADAM MARL,** | Case No. 3:20-cv-01631-YY |
| Plaintiffs, | **[PROPOSED] COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (FIRST SECOND AMENDED)** |
| vs. | |
| **KATTIE RIGGS**, City Recorder for Oregon City, in her official capacity, | |
| Defendant. | |

## OVERVIEW OF CASE

1.      In 2020, Plaintiffs were the proponents of a successful municipal recall petition directed against now-former Oregon City Mayor Dan Holladay. They bring this action to challenge Oregon's statutory 90-day signature gathering deadline as inconsistent with Article II,

section 18 of the Oregon Constitution and the First and Fourteenth Amendments to the U.S.

Constitution. Plaintiffs assert both facial and as-applied constitutional challenges.

2.      Article II, section 18 of the Oregon Constitution creates the recall power, which

allows voters to remove any public elected official from office via special election. To qualify

for the ballot under section 18, recall proponents must file a prospective recall petition and obtain

the signatures of 15% of the number of district electors who voted in the most recent four-year

gubernatorial election. To trigger a recall election in Oregon City in 2020, the required number

of signatures was 2,400.

3.      The Oregon Constitution contains no deadline for the gathering of recall petition

signatures, and does not authorize the Oregon Legislature to adopt such a deadline. Therefore,

ORS 249.875(1), which purports to impose a 90-day signature gathering deadline for all recall

petitions, is void as facially inconsistent with Article II, section 18 of the Oregon Constitution.[1]

4.      Even if the Oregon Constitution does permit the legislature to adopt a statutory

deadline for recall petition signature gathering, the 90-day deadline set forth in ORS 249.875(1)

is so short, so unrealistic, and so burdens the recall power, that it impermissibly infringes on the

peoples' right to recall their elected officials. This is particularly true during public health

emergencies and global pandemics, including but not limited to those related to COVID-19,

which can create, and have actually created, unprecedented barriers to traditional signature-

gathering efforts. For these reasons, ORS 249.875(1) is void as applied under Article II, section

18 of the Oregon Constitution.

---

[1]      Regulations implementing ORS 249.875(1) contain the same 90-day deadline. *See* OAR
165-014-0005(2) (designating 2020 Recall Manual); 2020 Recall Manual at 4, 6, 10 (90-day
limitation on signature gathering). Whenever plaintiffs herein challenge the 90-day deadline
contained in ORS 249.875(1), they also challenge the 90-day limitation contained in the 2020
Recall Manual and any document that replaces or amends it via rulemaking.

5.      Signature gathering for ballot petitions is core political speech under the First Amendment. The 90-day deadline contained in ORS 249.875(1) facially violates the First Amendment, as made applicable to the states through the Fourteenth Amendment, because it impermissibly burdens core political speech.

6.      Even if the 90-day deadline contained in ORS 249.875(1) is not facially void under the First Amendment, it is void as applied under the First Amendment because of the great burden of obtaining adequate recall petition signatures, in only 90 days, during a public health emergency and global pandemic, including but not limited to those related to COVID-19.

7.      By imposing a 90-day signature gathering deadline upon plaintiffs in reliance on ORS 249.875(1), Defendant Riggs violated plaintiffs' rights under Article II, section 18 of the Oregon Constitution and the First and Fourteenth Amendments.

8.      To preserve and defend the peoples' recall right, plaintiffs seek declaratory and injunctive relief declaring ORS 249.875(1) unconstitutional facially and as applied, and enjoining Defendant Riggs and the State of Oregon from imposing 90-day recall petition signature gathering deadlines in reliance upon it. Plaintiffs also seek nominal monetary damages for the completed injury to plaintiffs' First and Fourteenth Amendment rights.

## PARTIES

9.      Plaintiff **COMMITTEE TO RECALL DAN HOLLADAY** is a recall petition committee formed under ORS 260.118 to support Petition 2020-01, the prospective recall petition filed by Jeana Gonzales to initiate the recall election process against Oregon City Mayor Dan Holladay.

10.     Plaintiff **JEANA GONZALES** is an Oregon City elector and was the chief petitioner of Oregon City Petition 2020-01. A civically active resident, Ms. Gonzales is the co-

founder of Unite Oregon City, a grass-roots community non-profit with the following mission

statement:

> "Unite Oregon City is an active non-partisan volunteer group working to create an
> inclusive community where all voices are heard and respected. Our mission is to
> promote equity and acceptance within the community of Oregon City and
> surrounding areas, rejecting prejudice based on, but not limited to, ethnicity,
> cultural background, age, gender identity, sexuality, socioeconomic status,
> disability, citizenship status, spiritual faiths, skin color and country of origin."

Ms. Gonzales also intends to participate in future recall petition campaigns in Oregon at the

local, county, regional, and state levels. At the local level (i.e. Oregon City), Ms. Gonzales

intends to file another recall petition in 2022, or as soon as this litigation is concluded.[2] ,

including but not limited to the recall At the county level, Ms. Gonzales intends to participate in

the recall campaigns against Clackamas County Commissioner Mark Shull and Clackamas

County Chair Tootie Smith, both of which are in the planning stages.[3] Ms. Gonzales has no

immediate plans to participate in any regional or state-level recall petition campaigns, but she

will participate in recall campaigns at those levels if and when she believes an elected official at

the regional or state level is deserving of being recalled.

---

[2]     Ms. Gonzales prefers not to publicly identify the specific local elected official that will be
the subject of the recall petition. However, she has privately identified a specific local elected
official.

[3]     With regard to the effort to recall Commissioner Shull, a formal recall petition will be
filed in the summer of 2022, and Ms. Gonzales will participate either as a chief petitioner, a
volunteer signature gatherer, or both. She will also, of course, sign the recall petition as an
elector of Clackamas County. (Note: Summer is regarded as the best time of year to file a recall
petition. More people congregate outside during the summer than in the winter, spring, or fall,
and signature gathering at large outdoor events is typically a successful tactic. Door-to-door
canvassing is also more successful in the summer. In the era of COVID-19, it is even less
advisable to file a recall petition during cold weather.)

        The filing date for the formal recall petition against Chair Smith is not yet set but is
anticipated for the summer of 2023. Ms. Gonzales will participate in that recall effort either as a
chief petitioner, a volunteer signature gatherer, or both. She will also sign the recall petition as an
elector of Clackamas County.

11.     Plaintiff **ADAM MARL** is an Oregon City elector and was the campaign manager for the Committee to Recall Dan Holladay. Active in politics since he was 15 years old, Mr. Marl recently served as the campaign manager for Jeff Gudman, the 2020 Republican candidate for Oregon State Treasurer, and is currently employed by the Ron Noble for Congress campaign. Now a senior at Willamette University, Mr. Marl recently graduated from Willamette University is scheduled to graduate with a B.A. in Politics, Policy, Law, and Ethics, along with a minor in Civic Communication and Media. Mr. Marl's professional plans include political campaign management, political consulting, and related work. In both his personal and professional capacities, Mr. Marl intends to participate in future recall petition campaigns in Oregon at the local, county, regional, and state levels, including one in 2022 (and likely 2023).[4]

12.     Defendant **KATTIE RIGGS** is the City Recorder for the City of Oregon City and was the recall election filing officer for Petition 2020-01. ORS 249.865 *et seq.*; OAR 165-014-0110(2)(a).  In that capacity Ms. Riggs was the responsible elections officer under Article II, section 18(6) of the Oregon Constitution, which reads: "The recall petition shall be filed with the officer with whom a petition for nomination to such office should be filed, and the same officer shall order the special election when it is required." Ms. Riggs is named only in her official capacity.

---

[4]     Mr. Marl is currently serving as an elected official in Oregon City. In that capacity, he needs to preserve his ability to work with other elected officials (especially at the Oregon City and Clackamas County levels). Accordingly, Mr. Marl declines at this time to identify with specificity which elected official(s) he intends to work to recall, and at which level(s) of government.

Mr. Marl's participation in a 2022 Oregon recall effort will be in his professional capacity (i.e. as campaign manager), his personal capacity (i.e. as a volunteer signature gatherer), or both. He will also sign the recall petition as a qualified elector of the applicable jurisdiction. Unlike Ms. Gonzales, he is unlikely to serve as a chief petitioner in an Oregon recall in 2022 or 2023.

13.     The **STATE OF OREGON** ("the State") has filed an unopposed motion to intervene pursuant to 28 U.S.C. § 2403(b), which plaintiffs anticipate the court will grant. Under that statute, upon being granted intervention the State will have all the rights and obligations of a party defendant:

> "In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The State shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality."

*Id.* The State, through the Oregon Department of Justice, represents all State agencies, officers, and employees. Although this case involves a municipal recall petition wherein Defendant Riggs was the responsible elections officer, the validity or invalidity of the challenged statute, ORS 249.875(1), is critical to elections officers throughout Oregon, including the Oregon Secretary of State, because that statute directly impacts their administration of recall petitions at all levels of government. The State's participation as a full intervenor-defendant in this case is therefore appropriate.

## JURISDICTION AND VENUE

14.     This court has jurisdiction over plaintiffs' First and Fourteenth Amendment claims under 42 U.S.C § 1983 pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights jurisdiction), 2201 (declaratory relief), 2202 (injunctive relief). This court has supplemental jurisdiction over plaintiffs' Oregon state law claims made herein pursuant to 28

PAGE 6 OF 22 - COMPLAINT - DECLARATORY AND INJUNCTIVE RELIEF (2nd Amended)

U.S.C. § 1367. *See also Lane v. Wilson*, 307 U.S. 268, 274-75 (1939). Plaintiffs have exhausted

any available administrative remedies.

15.    This court has personal jurisdiction over defendant Riggs because she is the City

Recorder for Oregon City, which is located in Clackamas County in the State of Oregon. Further,

Ms. Riggs resides and maintains her office in the State of Oregon.

16.    Venue is properly vested in this court pursuant to 28 U.S.C. § 1391(b) because all

parties reside or have their principal offices located in Oregon, and the events or omissions

giving rise to the claims occurred and will continue to occur in Oregon.

17.    This case is properly filed in Portland, Oregon and is properly before the Portland

Division of this District pursuant to Local Rule 3-2(b) because Ms. Riggs' office is located in

Oregon City, Clackamas County, State of Oregon, and the events giving rise to this action took

place in Oregon City.

## FACTS

### Overview

18.    On June 22, 2020 plaintiffs filed with City Recorder Kattie Riggs a prospective

recall petition against Oregon City Mayor Dan Holladay. *See* Ex. 1 (prospective petition). The

prospective petition contained the following statement regarding the reasons for the recall:

> Citizens of Oregon City are uniting to demand ethical and accountable leadership
> from the mayor's office.
>
> All four Oregon City Commissioners want to see Dan Holladay resign, but they
> do not have the power to remove him--only we, the people, do.
>
> - Holladay is the subject of a misconduct investigation ordered by the four
>   Oregon City Commissioners.
> - Taxpayers are footing the bill for multiple lawsuits related to Holladay's
>   corrupt business deals and behavior.

PAGE 7 OF 22 - COMPLAINT - DECLARATORY AND INJUNCTIVE RELIEF (2nd Amended)

- Holladay was officially censured on June 17, 2020 for "injuring the good name of Oregon City, disturbing its well-being, and hampering its worth."
- Holladay exhibits dishonest and irresponsible behavior, abusing the power of his office.
- Holladay uses his office to silence and denigrate the voices of elected colleagues and constituents who disagree with him.
- Holladay was the only mayor out of all 26 in the metro area to refuse to sign a statement condemning systemic racism and committing to address it at the local level.
- Holladay's actions damage our city's reputation, hindering local economic development.
- Our Commissioners agree: Holladay is impeding the work of the city.
- "Please resign." - Commissioner Rocky Smith

www.RecallDanHolladay.com

19.    The next day, on June 23, 2020, defendant Riggs accepted the prospective petition and issued cover and signature sheets for use in signature gathering. *See* Ex. 2 (cover and signature sheets). Ms. Riggs also approved an electronic signature sheet for use in signature gathering. *See* Ex. 3 (electronic signature sheet).

20.    At the time she approved the prospective petition for signature gathering, Ms. Riggs established a minimum threshold of 2,400 valid signatures to trigger a recall election. *See* Or. Const. Art. II, § 18(2) (default recall election threshold is signatures equal to 15% of the number of electors who voted for Governor in the electoral district at the most recent election at which a candidate for Governor was elected to a full term).

21.    Relying on ORS 249.875(1), Ms. Riggs established a 90-day signature submission deadline of September 21, 2020.

22.    On August 14, 2020, the undersigned attorney for plaintiffs sent a letter to Ms. Riggs asking her to withdraw her September 21st deadline. *See* Ex. 4 (Aug. 14th letter). The letter explaineds that the statutory 90-day signature gathering deadline violates Article II, section 18 of the Oregon Constitution both on its face and as applied.

PAGE 8 OF 22 - COMPLAINT - DECLARATORY AND INJUNCTIVE RELIEF (2nd Amended)

23.     On August 20, 2020, Ms. Riggs responded in writing, refusing to withdraw her September 21st deadline. *See* Ex. 5 (Aug. 20th letter).

24.     The recall petition campaign, including plaintiffs' signature gathering efforts, took place entirely during the COVID-19 pandemic and the period covered by Governor Brown's related public health emergency orders. The COVID-19 pandemic made traditional political petition signature gathering very difficult. The same is true of the regional fires, smoke, and related evacuations that began less than two weeks before the September 21st signature gathering deadline.

25.     Despite these obstacles, plaintiffs were creative and diligent in their signature gathering efforts, and obtained more than 3,400 raw signatures on the Petition 2020-01. Those signatures were submitted by plaintiffs to Ms. Riggs for verification on or before the September 21, 2020 deadline imposed by Ms. Riggs.

26.     On October 1, 2020, Ms. Riggs certified that a sufficient number of recall petition signatures, 3,037, had been verified and accepted, and she called a special recall election for November 10, 2020.

27.     The recall election was held on November 10, 2020. In that election, 68% of Oregon City voters opted to recall Mr. Holladay. On November 30, 2020, the election results were certified and Mr. Holladay was automatically removed from office that day.

27.     **Signature-Gathering Efforts and the Impact of the 90-Day Deadline**

28.     Plaintiffs' entire recall petition campaign effort and signature gathering strategy was shaped by the pressure and demands of the 90-day signature gathering deadline imposed by Ms. Riggs pursuant to ORS 249.875(1). As explained below, That effort and strategy was more

expensive, more difficult, and more likely to fail than it would have been had it not been

burdened by a 90-day signature gathering deadline.

29. The 90-day signature gathering deadline made plaintiffs' recall petition campaign

more *expensive* than it would have been without that deadline. For example, to gather enough

signatures before the 90-day deadline expired, plaintiffs hired a print and mail house, Gateway

Communications, Inc. ("Gateway"), to print and mail recall petition signature sheets (and

associated documents) directly to 11,210 voting households in Oregon City. That mailer packet

included a cover letter, instructions, a signature sheet, and a return envelope. *See* Ex. 6 (mailer

packet). Gateway charged plaintiffs $8,000 for this service, Ex. 7 (Gateway invoice), which

plaintiffs paid. That expense was, by far, the largest cost incurred by plaintiffs during the recall

campaign and raising funds for that expense on short notice was a hardship to plaintiffs. Also, to

facilitate the return of completed signature sheets from direct mail respondents, plaintiffs paid

hundreds of dollars to the United States Postal Service (USPS) to set up and operate a business

reply mail (BRM) account.

30. But-for the 90-day deadline imposed by Ms. Riggs, plaintiffs would not have sent

the direct mailer, nor hired Gateway, nor set up a BRM account. Indeed, but-for the 90-day

deadline, the mailer and BRM account would not have been necessary, and plaintiffs would have

relied more heavily on in-person signature gathering to obtain the needed number of recall

petition signatures. Because plaintiffs did not hire paid signature gatherers for their campaign, in-

person signature gathering was a zero-cost approach for plaintiffs.

31. As noted above, Ms. Riggs approved the recall petition for signature-gathering on

June 23, 2020, and established a 90-day signature gathering deadline of September 21, 2020.

Those 90 days were wholly contained within the time period covered by Governor Brown's

PAGE 10 OF 22 - COMPLAINT - DECLARATORY AND INJUNCTIVE RELIEF (2nd Amended)

COVID-19 emergency declaration. *See* Executive Order (EO) 20-24 (extending state of emergency under EO 20-03 from May 7, 2020, through July 6, 2020) (https://www.oregon.gov/gov/Documents/executive_orders/eo_20-24.pdf); EO 20-30 at 3 (extending state of emergency under EO 20-03 from July 6, 2020, through September 4, 2020) (https://www.oregon.gov/gov/Documents/executive_orders/eo_20-30.pdf); EO 20-38 at 3 (extending state of emergency under EO 20-03 from September 4, 2020, through November 3, 2020) (https://www.oregon.gov/gov/Documents/executive_orders/eo_20-38.pdf). During those 90 days, Clackamas County was subject to restrictions on outdoor social gatherings, social distancing was required, and public fear of COVID-19 was pervasive (and rightly so). As a result, large outdoor gatherings were virtually non-existent, and door-to-door canvassing for petition signatures was, for all practical purposes, not a viable or responsible option. In other words, while signature gathering campaigns have traditionally relied on large public gatherings and door-to-door canvassing to engage potential signers, the restrictions and responsible safety protocols associated with COVID-19 effectively took those options off the table for the recall campaign. Therefore, from the campaign's start, the challenges associated with the COVID-19 pandemic were substantial.

32.    Before hiring Gateway to print and mail the signature sheet packets directly to voting households in Oregon City, the campaign engaged in a variety of other signature-gathering efforts. Because the COVID-19 pandemic was the backdrop for the entire recall effort, the campaign largely relied on the following creative signature-gathering solutions:

- Online pre-registration for signing, with options to:
  - Schedule personal outdoor signing appointments; and
  - Have signature sheets delivered to a voter's home, or mailed/emailed to the voter.

**Formatted:** Line spacing: single

**Formatted:** Indent: Left: 1.5", No bullets or numbering

- Outdoor drive-through signing stations;
- Web-based printable electronic signature sheets ("e-sheets");
- Socially distanced presence at the weekly Oregon City Farmers Market and the few other organized outdoor public events that complied with physical distancing requirements; and
- Intense volunteer recruitment to activate existing small networks (*e.g.* intra-household and neighbor-to-neighbor engagement).

33.    The recall campaign was an all-volunteer effort, and yet it was well-organized and efficient. Before the campaign launched, the following volunteer leadership positions were filled: Campaign Manager, Deputy Campaign Manager, Office Manager/Scheduler, Volunteer Coordinator, Assistant Volunteer Coordinator, Field Director, Signature-Gathering Educator, Signature-Gathering Coordinator, Phone Bank Lead, Constituency Organizer, Communications/Press Secretary, Social Media Coordinator, Finance/Fundraising Director, Technology Director/Website Manager, and Legal Counsel. Not long after the campaign launched, more than 100 volunteers were engaged in the recall effort. Members of the leadership team communicated and strategized daily and held weekly planning meetings. Collectively, campaign volunteers spent many hundreds of hours organizing, planning, and working to obtain petition signatures.

34.    30 days after receiving approval to circulate the signature sheets, the campaign had obtained approximately 1,340 raw signatures (43% of the campaign's goal of 3,100 raw signatures[5]). By day 45, that total had risen to approximately 1,613 raw signatures (52% of the campaign's goal). By day 60, the total had risen to approximately 1,961 raw signatures (63% of the campaign's goal). At that rate, the campaign was not on track to obtain enough raw signatures by the 90-day deadline. Indeed, as time went on, it was getting more and more

---

[5]    The goal of 3,100 raw signatures was 700 more than the required 2,400 verified signatures, to account for the typical signature invalidity rate of 20-25%.

difficult for volunteers to obtain new signatures. It was clear to the campaign leadership that, despite the dedication, diligence, and persistence of its many volunteers, a new, expensive approach would be needed in order to obtain a sufficient number of raw signatures by the September 21st deadline. That approach was the $8,000 direct mailer through Gateway.

35. The campaign made the decision to hire Gateway at or around the 45-day mark, but the mailer was not funded, designed, printed, and ready to mail until day 69 (August 31st), 21 days before the September 21st deadline. The mailers were delivered on September 2nd, 19 days before the deadline.

36. The direct-mail approach worked well. Out of the 11,210 mailers sent out, approximately 646 recipients responded (a 5.8% return rate), and most of the respondents included completed signature sheets in their return envelopes. For each returned piece of business reply mail, the USPS charged the campaign $1.40, for a total cost of approximately $900. The signature sheets returned from the direct mailers contained over 1,000 additional raw signatures. By contrast, after the mailer was sent, only several hundred more additional signatures were gathered via traditional signature-gathering methods.[6]

37. But-for the expensive direct mailer tactic, the campaign would not have gathered sufficient signatures within 90 days (i.e. before the September 21st deadline set by Ms. Riggs). However, but-for the 90-day deadline, the campaign would *not* have utilized the direct mailer tactic, and therefore would *not* have incurred the expense associated with the direct mailer.

---

[6] This low number of traditionally-gathered signatures in the final weeks of the 90-day period is due, in large part, to the 2020 wildfires. Fire-related evacuations began in Oregon City on September 8, 2020, and continued until September 17, 2020, just four days before the September 21st deadline established by Ms. Riggs. *See* https://www.clackamas.us/news/2020-09-08/wildfires-cause-state-of-emergency-in-clackamas-county; https://www.clackamas.us/sheriff/2020-09-13-CCSOPR-FireEvacLevelsUpdate.html. Many Oregon City voters (and campaign volunteers) evacuated Oregon City during this time, substantially curtailing signature-gathering efforts and opportunities.

38.    The 90-day signature gathering deadline made plaintiffs' recall petition campaign more *difficult* for the same reasons that it made signature gathering more expensive (as described above). Further, it is a truism that it is more difficult to gather a certain number of signatures within 90 days than it is to gather that same number of signatures *without* a 90-day deadline. For example, if the campaign had had more than 90 days to gather signatures, it would not have dominated the campaign volunteers' lives (including Gonzales' and Marl's lives) to the same extent and intensity. The 90-day deadline required many campaign volunteers to dedicate most, if not all, of their free time over a 90-day period to campaign efforts. That was a hardship to the volunteers and to the campaign because it required volunteers to ignore other important matters, both personal and professional, to their detriment. The level of focus, intensity, and time required of the volunteers by the 90-day limit therefore made the campaign more difficult than it otherwise would have been without the 90-day limit.

28.39.  The 90-day signature gathering deadline made plaintiffs' recall petition campaign ***more likely to fail*** for the same reasons that it made signature gathering more expensive and more difficult (as described above). Further, it is obvious that a time limitation acts to decrease the likelihood that an effort will be successful; by definition, a time limitation means that an effort will fail if it does not meet the time limitation. Further, while this recall campaign ultimately succeeded in gathering a sufficient number of signatures to put the issue on the ballot, it is well-established that most recall campaigns fail to obtain the requisite number of petition signatures. This is, in large (and obvious) part, due to lack of adequate time to gather signatures. Therefore, the 90-day limitation made plaintiffs' recall petition campaign more likely to fail than if the 90-day limitation was not imposed.

**Formatted:** Font: Bold

**LEGAL FRAMEWORK**

**The Recall Right (Or. Const., Art. II, § 18)**

~~29.~~40.  Adopted via initiative in 1908, Oregon's recall right is contained in Article II,

section 18 of the Oregon Constitution, which states in full as follows:

"(1) Every public officer in Oregon is subject, as herein provided, to recall by the electors of the state or of the electoral district from which the public officer is elected.

"(2) Fifteen per cent, but not more, of the number of electors who voted for Governor in the officer's electoral district at the most recent election at which a candidate for Governor was elected to a full term, may be required to file their petition demanding the officer's recall by the people.

"(3) They shall set forth in the petition the reasons for the demand.

"(4) If the public officer offers to resign, the resignation shall be accepted and take effect on the day it is offered, and the vacancy shall be filled as may be provided by law. If the public officer does not resign within five days after the petition is filed, a special election shall be ordered to be held within 35 days in the electoral district to determine whether the people will recall the officer.

"(5) On the ballot at the election shall be printed in not more than 200 words the reasons for demanding the recall of the officer as set forth in the recall petition, and, in not more than 200 words, the officer's justification of the officer's course in office. The officer shall continue to perform the duties of office until the result of the special election is officially declared. If an officer is recalled from any public office the vacancy shall be filled immediately in the manner provided by law for filling a vacancy in that office arising from any other cause.

"(6) The recall petition shall be filed with the officer with whom a petition for nomination to such office should be filed, and the same officer shall order the special election when it is required. No such petition shall be circulated against any officer until the officer has actually held the office six months, save and except that it may be filed against a senator or representative in the legislative assembly at any time after five days from the beginning of the first session after the election of the senator or representative.

"(7) After one such petition and special election, no further recall petition shall be filed against the same officer during the term for which the officer was elected unless such further petitioners first pay into the public treasury which has paid such special election expenses, the whole amount of its expenses for the preceding special election.

"(8) Such additional legislation as may aid the operation of this section shall be provided by the legislative assembly, including provision for payment by the public treasury of the reasonable special election campaign expenses of such officer. But the words, "the legislative assembly shall provide," or any similar or equivalent words in this constitution or any amendment thereto, shall not be construed to grant to the legislative assembly any exclusive power of lawmaking nor in any way to limit the initiative and referendum powers reserved by the people."

~~30.~~41.  Article II, section 18 contains no time limitation on signature gathering, except for the obvious and implicit requirement that signatures be gathered during the elected official's term of office.

~~31.~~42.  Nor does section 18 authorize the legislative assembly to establish a time limitation for signature gathering. Although subsection (8) authorizes the Oregon Legislature to enact statutes "as may aid the operation of this section," the Oregon Supreme Court has interpreted the word "aid" in section 18 to mean "to support, help, or assist." *State ex rel. Clark v. Harris*, 74 Or 573, 580 (1914). A statutory signature gathering time limitation does not "support, help, or assist" the operation of section 18. Instead, such a statutory time limit impermissibly curtails and burdens section 18's self-executing recall power. *See Harris,* 74 Or at 585 (section 18 is self-executing and requires no implementing legislation).

~~32.~~43.  Subsection 18(2) imposes a ceiling on how many signatures recall petitioners may be required to file in order to trigger a special recall election. That maximum threshold is 15% of the number of electors who voted for Governor in the electoral district at the most recent election at which a candidate for Governor was elected to a full term. *Id.* Section 18 does not specify a minimum threshold for signatures.

~~33.~~44.  The Oregon Supreme Court has held that, in the absence of legislation or a municipal charter provision electing a lower percentage threshold for recalls, the maximum percentage threshold applies. *See Harris*, 74 Or at 579-80 (applying maximum percentage

threshold of 25 percent under original version of Article II, section 18); *State ex rel. Postlethwait v. Clark*, 143 Or 482, 488 (1933) (looking first to the charter of the City of Baker in evaluating applicable recall procedure). Therefore, in the absence of an applicable local or statewide downward election, the default signature threshold for recalls is 15%. The Oregon Legislature has elected the 15% maximum, *see* ORS 249.870, while Oregon City has not made an affirmative election, and therefore defaults to the 15% threshold.

### The Statutory 90-Day Limitation - ORS 249.875(1)

~~34.~~45.   As part of the 1933 recall legislation package, the legislative assembly adopted the 90-day signature gathering limitation as part of what became *former* O.C.L.A. 81-2202. That statute was renumbered as *former* ORS 254.420 in 1953, and became ORS 249.875(1) in 1979.

~~35.~~46.   The current statute, ORS 249.875(1), reads as follows:

"A recall petition shall be void unless completed and filed not later than the 100th day after filing the prospective petition described in ORS 249.865. **Not later than the 90th day after filing the prospective petition the petition shall be submitted to the filing officer** who shall verify the signatures not later than the 10th day after the submission. The filed petition shall contain only original signatures. A recall petition shall not be accepted for signature verification if it contains less than 100 percent of the required number of signatures. The petition shall not be accepted for filing until 100 percent of the required number of signatures of electors have been verified."

*Id.* (bolding added).

47.   No known Oregon trial court or appellate decision has ever addressed the constitutionality of the 90-day signature gathering limitation.

~~36.~~

**Formatted:** Indent: Left: 0.5", Line spacing: single, No bullets or numbering

**FIRST & FOURTEENTH AMENDMENTS**

37.48.  The First Amendment to the U.S. Constitution states as follows:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise therefore; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the government for a redress of grievances."

U.S. Const., Am. 1. The First Amendment is applicable to the states via the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652 (1925).

38.49.  The First and Fourteenth Amendments secure the rights of Oregonians to speech and political expression free from government interference or hindrance. Circulation of petitions is core protected speech. *Prete v. Bradbury*, 438 F.3d 949, 961 (9th Cir. 2006); see also *Meyer v. Grant*, 486 U.S. 414, 420 (1988).

39.50.  Regulations and restrictions on the right to vote and engage in political expression is assessed under the sliding-scale standards established by *Anderson v. Celebrezze*, 460 U.S. 780 (1984) and *Burdick v. Takushi*, 504 U.S. 428 (1992). If a severe burden on these rights is established, then strict scrutiny applies. *See, e.g.*, *Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966); *Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012).

**CLAIMS FOR RELIEF**

**First Claim for Relief**
**(Violations of Or. Const., Art. II, § 18 – Undue Burden on Recall Right)**
**(ORS 28.010 *et seq* and ORS 246.910(1))**

40.51.  Plaintiffs reallege and incorporate by reference all prior paragraphs into each of the counts set forth below.

COUNT ONE

41.52.  The 90-day signature gathering limitation contained in ORS 249.875(1) does not "aid," unduly burdens, is not authorized by, and facially violates the recall right of Article II, section 18 of the Oregon Constitution, and is therefore void and unenforceable. Accordingly, the September 21, 2020 signature gathering deadline imposed by Ms. Riggs violated plaintiffs' recall rights under Article II, section 18 of the Oregon Constitution.

COUNT TWO

42.53.  Even if the 90-day limitation is not facially invalid under the Oregon Constitution, it is void as applied. Specifically, in light of the public health emergency created by the COVID-19 pandemic and the impacts of the recent September 2020 regional fires, smoke, and related evacuations, the 90-day signature gathering limitation contained in ORS 249.875(1) is void as applied under Article II, section 18 of the Oregon Constitution. Accordingly, the September 21, 2020 signature gathering deadline imposed by Ms. Riggs violated plaintiffs' recall rights under Article II, section 18 of the Oregon Constitution.

**Second Claim for Relief**
**(Violations of 1st and 14th Amendments – Undue Burden on Ballot Access**
**and Rights to Freedom of Speech and Association)**
**(42 U.S.C. § 1983, 28 U.S.C. §§ 1331, 1343, 2201, and 2202)**

43.54.  Plaintiffs reallege and incorporate by reference all prior paragraphs into each of the counts set forth below.

<u>COUNT ONE</u>

44.55.  The 90-day signature gathering limitation contained in ORS 249.875(1) unduly burdens core political speech and is facially invalid under the First and Fourteenth Amendments. Accordingly, the September 21, 2020 signature gathering deadline imposed by Ms. Riggs violated plaintiffs' rights under the First and Fourteenth Amendments.

45.56.  Plaintiffs are entitled to nominal monetary damages of $1 under *Uzuegbunam v. Preczewski*, 592 U.S. ____ (2021).

<u>COUNT TWO</u>

46.57.  Even if the 90-day limitation is not facially invalid under the First and Fourteenth Amendments, it is void as applied under the circumstances. Specifically, in light of the public health emergency created by the COVID-19 pandemic and the impacts of the recent September 2020 regional fires, smoke, and related evacuations, the 90-day signature gathering limitation contained in ORS 249.875(1) unduly burdens core political speech and is void as applied under the First and Fourteenth Amendments. Accordingly, the September 21, 2020 signature gathering deadline imposed by Ms. Riggs violated plaintiffs' rights under the First and Fourteenth Amendments.

58.   Plaintiffs are entitled to nominal monetary damages of $1 under *Uzuegbunam v. Preczewski*, 592 U.S. ____ (2021).

47.

**PRAYER FOR RELIEF**

Formatted: Indent: Left: 0.5", Line spacing: single, No bullets or numbering

WHEREFORE, plaintiffs respectfully request that the court:

A.   Declare the 90-day limitation on signature gathering contained in ORS 249.875(1), and all implementing administrative rules, facially void under Article II, section 18 of the Oregon Constitution;

B.   Declare the 90-day limitation on signature gathering contained in ORS 249.875(1), and all implementing administrative rules, void as applied under Article II, section 18 of the Oregon Constitution;

C.   Declare that Defendant Riggs' imposition of a September 21, 2020 signature-gathering deadline under ORS 249.875(1) violated plaintiffs' recall rights under Article II, section 18 of the Oregon Constitution;

D.   Declare the 90-day limitation on signature gathering contained in ORS 249.875(1), and all implementing administrative rules, facially void under the First and Fourteenth Amendments;

E.   Declare the 90-day limitation on signature gathering contained in ORS 249.875(1), and all implementing administrative rules, void as applied under the First and Fourteenth Amendments;

F.   Declare that Defendant Riggs' imposition of a September 21, 2020 signature-gathering deadline under ORS 249.875(1) violated plaintiffs' rights under the First and Fourteenth Amendments, including but not limited to their rights to speech and political expression;

PAGE 21 OF 22 - COMPLAINT - DECLARATORY AND INJUNCTIVE RELIEF (2nd Amended)

G.      Grant plaintiffs nominal monetary damages in the amount of $1, under

*Uzuegbunam v. Preczewski*, 592 U.S. ___ (2021);

H.      Issue prospective and permanent injunctive relief preventing Ms. Riggs and the

State, and their agencies, officers, and employees, from enforcing or otherwise applying the 90-

day limitation on signature gathering contained in ORS 249.875(1);

I.      Award plaintiffs their reasonable costs, litigation expenses, and attorney fees

associated with this litigation pursuant to 42 U.S.C. § 1988, ORS 183.497, and the public benefit

doctrine under *Deras v. Myers*, 272 Or 47 (1975) and its progeny; and

J.      Grant such further relief as the court deems just and proper.

Dated this 10th day of December 2021.

_____
Jesse A. Buss, OSB # 122919
WILLAMETTE LAW GROUP
411 5th St.
Oregon City OR 97045
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

Attorney for Plaintiffs Committee to Recall
Dan Holladay, Jeana Gonzales, and Adam
Marl