UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

COMMITTEE TO RECALL DAN HOLLADAY, JEANA GONZALES, and ADAM MARL,

Plaintiffs,

v.

JAKOB WILEY, City Recorder for Oregon City, in his official capacity,

Defendant,

and

STATE OF OREGON,

Intervenor.

Case No. 3:20-CV-01631-YY

FINDINGS AND RECOMMENDATIONS

YOU, Magistrate Judge.

**FINDINGS**

The plaintiffs in this case—the Committee to Recall Dan Holladay, Jeana Gonzales, and Adam Marl—bring this action against defendant Jakob Wiley in his official capacity as the City Recorder for Oregon City.[1] Plaintiffs allege that defendant's enforcement of O.R.S. § 249.875, a state statute mandating a 90-day period for recall proponents to collect a sufficient number of

[1] The original defendant to this action was Kattie Riggs, who, at the commencement of this lawsuit, served as City Recorder for Oregon City. Riggs has since departed the office, and Wiley succeeded her as City Recorder. *See* Not. Subs. Party, ECF 37; FED. RULE CIV. P. 25(d).

signatures, violated their rights to free speech and political expression under the First and Fourteenth Amendments to the U.S. Constitution, as well as their right to recall state officials under Article II, Section 18 of the Oregon Constitution. *See* Second Am. Compl. ¶¶ 51-58, ECF 42. In addition to the parties above, the State of Oregon ("the state") has successfully moved to intervene in this dispute. *See* ECF 18, 30. This court has federal question jurisdiction over plaintiffs' First and Fourteenth Amendment claims and supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1331, 28 U.S.C. § 1367.

The state has filed a motion to dismiss plaintiffs' claims. State Mot. Dismiss, ECF 21. Defendant joined in the state's motion and also filed a separate motion to dismiss. Def. Corrected Mot. Dismiss, ECF 23. In response to standing and mootness-related questions from the court, the parties filed supplemental briefing, and as part of that supplemental briefing, plaintiffs proffered a Proposed Second Amended Complaint (ECF 36-1). *See* Pl. First Supp. Br., ECF 36; State First Supp. Br., ECF 38; Def. First Supp. Br., ECF 39.

On March 22, 2022, the undersigned advised the parties that it appeared the *Pullman* abstention doctrine applied, and requested that plaintiffs formally file their Second Amended Complaint in the record to allow for efficient resolution. In response, plaintiffs asked for the opportunity to file a motion to certify a question to the Oregon Supreme Court, which would present an alternative to dismissing the state law claims pursuant to *Pullman* abstention.

Plaintiffs formally filed their Second Amended Complaint, *see* ECF 42, and subsequent briefing on plaintiffs' motion to certify followed. *See* Mot. Cert., ECF 43; State Opp. Mot. Cert., ECF 44; Def. Opp. Mot. Cert., ECF 45; Pl. Reply Mot. Cert., ECF 46. As agreed to by the parties in their Joint Motion for a Case Management Order, ECF 40, and the related Scheduling Order, ECF 41, the court applies "the previously-filed Motion to Dismiss for Lack of

Jurisdiction[, ECF] 21 and Motion to Dismiss and Joinder[, ECF] 23 and all briefing, supplemental briefing, and exhibits that have been filed regarding those motions." Finally, in response to abstention-related questions from the court, the parties filed additional supplemental briefing in July and August 2022. *See* State Second Supp. Br., ECF 49; Def. Second Supp. Br., ECF 50; Pl. Second Supp. Br., ECF 51.

For the reasons stated herein, the state and defendant's respective motions to dismiss (ECF 21, 23) should be GRANTED. Specifically, plaintiffs' state law claims should be dismissed because they are either moot or the *Pennhurst* doctrine applies, preventing this federal court from conferring any form of relief. Plaintiffs' claims under federal law should be dismissed because they are either moot or fail to demonstrate a First Amendment violation under relevant caselaw. Additionally, plaintiffs' motion for certification of a question to the Oregon Supreme Court (ECF 43) should be DENIED.

## I. Factual and Procedural Background

This dispute arises from a legal challenge surrounding Oregon's recall laws. Article II, Section 18 of the Oregon Constitution allows for the recall of "[e]very public officer in Oregon," and proscribes procedures for the recall process. As relevant to this case, the Oregon Constitution requires that to initiate a recall election, a petitioner must receive support (often in the form of a signature) from at least fifteen percent of the official's constituency. *Id.* Crucially, this provision of the Oregon Constitution is silent regarding the amount of time a petitioner has to collect a sufficient number of signatures. However, a state statute—O.R.S. § 249.875—imposes a deadline of 90 days for a petitioner to collect the requisite number of signatures. Plaintiffs challenge the legality of this statute, arguing that the 90-day deadline

unconstitutionally infringes upon the recall authority contained in the Oregon Constitution and free speech and political expression rights protected by the U.S. Constitution.

The specific events in this dispute began on June 22, 2020, when plaintiffs filed a petition seeking to collect signatures for the prospective recall of then-Oregon City Mayor Dan Holladay. Second Am. Compl. ¶ 18, ECF 42. The next day, then-City Recorder Kattie Riggs accepted the petition, issued signature collection forms, and established a threshold of 2,400 valid signatures for plaintiffs to meet. *Id.* ¶ 20. Riggs also established, in accordance with O.R.S. § 249.875(1), a 90-day period for plaintiffs to collect signatures, thus requiring that plaintiffs meet the signature threshold by September 21, 2020, to trigger a recall election. *Id.* ¶ 21.

On August 14, 2020 (the 52nd day of the period), plaintiffs requested that Riggs withdraw the September 21, 2020 signature collection deadline, alleging the collection period was unconstitutional on its face or as-applied during a public health crisis. *Id.* ¶ 22. Six days later, on August 20, 2020, Riggs refused plaintiffs' request. *Id.* ¶ 23. Plaintiffs commenced this suit on September 18, 2020, three days before the end of their signature collection period. ECF 1. On September 21, 2020, the deadline for signature collection, plaintiffs submitted over 3,400 raw signatures to Riggs for verification. Second Am. Compl. ¶ 25, ECF 42. Riggs subsequently certified that 3,037 valid signatures were submitted and set a special recall election for November 10, 2020. *Id.* ¶ 26. The election was ultimately successful, and Holladay was removed from office on November 30, 2020. *Id.* ¶ 27.

Plaintiffs have continued pursuing this lawsuit despite their successful recall effort. They ask this court to find that O.R.S. § 249.875, the statute that requires the signatures to be collected within 90 days to trigger a recall election, is either facially unconstitutional or unconstitutional as applied in light of the public health crisis created by the COVID-19 pandemic and destructive

summer wildfires. *See* Second Am. Compl. ¶¶ 51-58, ECF 42. Plaintiffs seek declaratory and injunctive relief, nominal damages of one dollar, and litigation expenses. *Id.*

## II. Legal Standards

### A. Rule 12(b)(1): Subject Matter Jurisdiction

A party may move to dismiss a claim for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Federal courts are courts of limited jurisdiction and are "presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock W., Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989). "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To show standing, a plaintiff must demonstrate (1) an injury-in-fact that is (2) fairly traceable to defendant's conduct and that (3) the court may adequately redress. *Id.* at 560-61. "The party invoking federal jurisdiction bears the burden of establishing [standing]." *Id.*

### B. Rule 12(b)(6): Failure to State a Claim

To state a claim for relief, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). This standard "does not require 'detailed factual allegations,'" but does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels

and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

A Rule 12(b)(6) motion tests whether there is a cognizable legal theory or sufficient facts to support a cognizable legal theory. *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015). To survive a Rule 12(b)(6) motion, "the complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). In evaluating a motion to dismiss, the court must accept all well-pleaded material facts alleged in the complaint as true and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012).

**III. State Sovereign Immunity—Declaratory Relief and Damages**

The state[2] argues that plaintiffs' request for declaratory relief and damages must be dismissed because defendant possesses state sovereign immunity under the Eleventh Amendment. State Mot. Dismiss 14-15, ECF 21. Generally, state officials cannot be sued for damages in their official capacities under 42 U.S.C. § 1983 because they are not considered "persons" within the meaning of the statute. *Will v. Michigan Dep't. of State Police*, 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the

[2] Defendant has joined in the state's motion to dismiss. Thus, when these findings and recommendations note that "the state" has alleged something, that includes both the state (the intervenor) and defendant. *See, e.g.*, Def. Corrected Mot. Dismiss & Joinder in State Mot. Dismiss, ECF 23; Def. Reply & Joinder in State's Reply, ECF 29; Def. Supp. Br. and Joinder in State Supp. Br., ECF 39; Def. Opp. Mot. Cert. & Joinder in State Opp. Mot. Cert., ECF 45; Def. Joinder in State's Second Supp. Br., ECF 50. Defendant has stated that he does not necessarily agree with all of the state's arguments in the state's opposition to certification, *see* Def. Opp. Mot. Cert. 2 n.1, ECF 45, but that nuanced clarification is not dispositive to these findings and recommendations.

official's office.").[3] The Eleventh Amendment also bars federal courts from enforcing a declaratory judgment against state officials for prior conduct. *Green v. Mansour,* 474 U.S. 64, 73-74 (1985) (denying petitioners' request for declaratory judgment after a change in federal law rendered their complaint moot). Thus, if defendant is entitled to state sovereign immunity, this court cannot award plaintiffs with either declaratory relief or any damages associated with Riggs' imposition of the 90-day deadline pursuant to O.R.S. § 249.875(1).

Defendant, as the City Recorder for Oregon City, is a local official. However, any "officer, be he state or local, is acting as a state official, i.e., a state agent" "when a state statutory regime comprehensively directs" his actions. *Buffin v. California*, 23 F.4th 951, 962 (9th Cir. 2022) (citing *Echols v. Parker*, 909 F.2d 795, 799 (5th Cir. 1990)). Here, as the state observes, state law directs defendant's actions during the recall process:

> [Oregon's] Legislative Assembly established the 90-day deadline for recall petitions. In addition, the Secretary of State specifically instructs local officials to follow the 90-day deadline. Oregon Secretary of State Recall Manual at 4, https://sos.oregon.gov/elections/Documents/RecallManual.pdf (adopted as a rule by OAR 165- 014-0005) ("Signatures are due no later than 5 pm 90 days after a prospective petition is filed with the elections official."). The City Recorder must follow the Secretary of State's directions. *See City of Eugene v. Roberts*, 91 Or. App. 1, 3, *aff'd,* 305 Or. 641 (1988) (holding that the Secretary of State, as the State's "chief election officer" under ORS 246.110, may direct a local election official not to place a measure on the ballot in violation of state law).

State Mot. Dismiss 13, ECF 21.

[3] There exists an important exception to this rule: parties are allowed to seek prospective relief against state officials (in their official capacities) under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." *Will v. Michigan Dep't. of State Police*, 491 U.S. 58, 71 n.10 (1989) (citing *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985); *Ex parte Young*, 209 U.S. 123, 159-60 (1908)). This exception preserves plaintiffs' claims for prospective and future injunctive relief for purposes of Eleventh Amendment immunity, although they ultimately do not survive, as discussed later.

Plaintiffs oppose this characterization and argue that "Riggs was not a state actor; rather, she was following the Oregon City Charter when she imposed and enforced the 90-day signature gathering deadline." Pl. Opp. Mots. Dismiss 22, ECF 26. Plaintiffs allege that Oregon cities are not required to follow O.R.S. § 249.875 because (1) the right of recall in the state Constitution is self-executing and not dependent on legislative statutes, (2) the text of O.R.S. § 249.875 does not reference local recall elections, and (3) any state action that requires a city to follow O.R.S. § 249.875 would violate that city's "home-rule authority to draft and amend its own charter." *Id.* 13-16. Thus, according to plaintiffs, cities are free to establish any election regulations that they see fit, and Oregon City's decision to "adopt Oregon's statewide election laws by reference" in its charter makes defendant's enforcement of those statewide election laws a municipal action, not one that is mandated by a state statutory regime. *Id.*

Plaintiffs' home rule argument overlooks a bedrock principle that is perpetually tied to local governance: the state's authority to preempt municipal affairs. While home rule authority allows cities to engage in self-governance without seeking the state's approval, it does not offer unfettered authority or immunity from state legislation. The doctrine of preemption provides that "a general law addressed primarily to substantive social, economic, or other regulatory objectives of the state prevails over contrary policies preferred by some local governments if it is clearly intended to do so[.]" *City of La Grande v. Public Employees Retirement Bd.*, 281 Or. 137, 156 (1978). The 90-day signature collection deadline described in O.R.S. § 249.875 clearly addresses the state's regulatory objectives surrounding election administration. Otherwise stated, if a city attempted to establish a different signature collection period, state law would preempt its application and require the use of the 90-day period in O.R.S. § 249.875.

Other portions of plaintiffs' theory are similarly unconvincing. For example, plaintiffs allege that the self-executing nature of Oregon's constitution eliminates the need to consult state legislation involving its provisions. Pl. Opp. Mots. Dismiss 28, ECF 26. But Article II, Section 8 of the Oregon Constitution, titled "[R]egulation of [E]lections," provides that "[t]he Legislative Assembly shall enact laws to . . . prescrib[e] the manner of regulating and conducting elections." Plaintiffs also allege that the text of O.R.S. § 249.875 does not reference Oregon cities. Pl. Opp. Mots. Dismiss 13, ECF 26. But that does not mean cities can ignore the statute—especially considering the statute does not reference any public entity whatsoever.

In short, plaintiffs' theory does not dislodge the existence of a state statutory regime that "comprehensively directs" an election official's handling of a recall petition. *Buffin*, 23 F.4th at 962. Thus, despite being a local official, Riggs was acting as a state agent when she enforced the 90-day deadline contained in O.R.S. § 249.875, and is therefore entitled to state sovereign immunity. Accordingly, plaintiffs cannot recover a declaratory judgment or money damages related to Riggs' service as City Recorder.

## IV. Standing and Mootness

The motions to dismiss from the state and defendant both allege problems involving standing and mootness. *See generally* State Mot. Dismiss, ECF 21; Def. Corrected Mot., ECF 23. "The doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). While the concepts are commonly intertwined, divorcing them in this case is necessary to comprehensively analyze the presented issues. Of course, plaintiffs must demonstrate both standing and the absence of, or exception to, mootness, to maintain subject-matter jurisdiction. *United States Parole Comm'n v. Geraghty*, 445 U.S.

388, 397 (1980) ("The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).").

**A. Standing**

**1. Legal Standard**

Federal courts are courts of limited jurisdiction. *See Hollingsworth v. Perry*, 570 U.S. 693, 693 (2013) ("Article III of the Constitution confines the judicial power of federal courts to deciding actual 'Cases' or 'Controversies.'") (quoting U.S. CONST. art. III, § 2). An "essential element" of this limited jurisdiction is that "any person invoking the power of a federal court must demonstrate standing to do so." *Id.* (citing *Lujan*, 504 U.S. at 560-61). The "irreducible constitutional minimum of standing" requires the invoking party to establish three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (internal citations, ellipses, and quotation marks omitted). These are "not mere pleading requirements but rather an indispensable part of the plaintiff's case [and] each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561 (citations omitted). "[T]he plaintiff bears the burden of proof" that these elements exist. *Id.*

**2. Analysis**

Plaintiffs allege that Riggs' enforcement of O.R.S. § 249.875 "shaped" their signature gathering effort and strategy to be "more expensive, more difficult, and more likely to fail than it

would have been had it not been burdened by a 90-day signature gathering deadline." Second Am. Compl. ¶ 28, ECF 42. After being asked to clarify the expenses incurred to comply with the statute during the pandemic, plaintiffs submitted that they hired, at a cost of $8,000, a print-and-mail house to create and mail signature collection packets to over 11,000 voting households in Oregon City. *Id.* ¶ 29. Plaintiffs also claim that to facilitate the expeditious return of signature sheets, they established a business reply mail account with the United States Postal Service at a cost of "hundreds of dollars." *Id.*

The state does not dispute the existence of an injury-in-fact associated with plaintiffs' costs and efforts, nor does it dispute that the efforts and expenditures are sufficiently traceable to Riggs' actions. Instead, the state alleges that plaintiffs lack standing because of two redressability-related issues. First, the state argues that any injunction granted at the time this lawsuit was filed would not have redressed any expenditures or efforts that plaintiffs had already undertaken to improve their signature collection effort. State First Supp. Br. 3-4, ECF 38. Indeed, an injunction on the date of filing would not have redressed the efforts and costs that plaintiffs had already expended.

Second, the state claims that injunctive relief was unnecessary at the time plaintiffs filed suit because they were already on track to successfully trigger a recall election. *Id.* at 4. This argument rests on two facts in plaintiffs' Second Amended Complaint: first, that on the 60th day of the 90-day period, the campaign had collected "approximately 1,961 raw signatures," and second, that the signature collection packets, which were mailed to voters around the 70th day of the period, added "over 1,000 raw signatures" to the campaign's total. Second Am. Compl. ¶¶ 30, 35-36, ECF 42. The state uses these alleged facts to suggest that by the time plaintiffs filed suit, on the 87th day of the 90-day period, "it was already clear that the petition was not likely to

fail." State First Supp. Br. 4, ECF 38 (quotation marks removed). Put differently, the state's argument is that an injunction would have offered no redress because Riggs was unlikely to enforce the statute anyway.

This argument is unpersuasive on two grounds. First, as a practical matter, Riggs began enforcing the statute on June 23, 2020—the date she certified plaintiffs' petition and established, in accordance with state law, the 90-day period to collect signatures.[4] Second, the argument ignores the possibility that plaintiffs' signature collection effort could have failed. It is undisputed that on August 14, 2020, the 52nd day of the 90-day period, plaintiffs informed Riggs that they were "on track to reach their goal of 3,100 raw signatures." *See* Second Am. Compl., Ex. 4 at 2, ECF 42-4. It is also undisputed that plaintiffs ultimately submitted over 3,400 raw signatures at the end of the 90-day period. Second Am. Compl. ¶ 25, ECF 42. But the relevant inquiry is not the number of *raw* signatures the plaintiffs collected, but rather, the number of *valid* signatures they possessed.[5] That figure was unknown to plaintiffs at the time they filed suit. And while plaintiffs ultimately exceeded their signature collection goal (an internal metric that accounted for an "estimated typical signature invalidity rate" of 20 to 25%), a slightly higher

[4] This conclusion is bolstered by Riggs' August 20, 2020 letter in which she declined the campaign's request to waive the deadlines, and confirmed she would continue to enforce the statute and its 90-day collection period:

> I do not believe that I have the authority to unilaterally waive the applicable 90-day time limit for gathering of signatures as set forth in state law. Therefore, the deadline to submit the required 2,400 valid signatures for the petition is 5:00 p.m. on Monday, September 21, 2020 . . .

Second Am. Compl., Ex. 5, ECF 42-5.

[5] An elections office can invalidate petition signatures for any number of reasons, including duplicative signatories, signatures from ineligible persons (such as nonresidents and non-registered voters), and fictitious signatories or addresses.

invalidity rate of 30% would have doomed their petition.[6] Second Am. Compl. ¶ 34 n.5, ECF 36-1. Thus, at the time plaintiffs initiated this lawsuit, they possessed a well-established fear that their petition could fail, and an injunction against Riggs would have redressed that injury. Accordingly, plaintiffs have demonstrated that they possessed standing at the commencement of this litigation.

**B. Mootness**

The state also contends that the dispute is moot because plaintiffs succeeded in recalling Holladay in November 2021. State Reply Mot. Dismiss 3, ECF 27. Plaintiffs disagree, arguing that (1) their claim for nominal damages to remedy Riggs' alleged constitutional violation prevents mootness, and (2) in any event, their facial and as-applied challenges fall under the "capable of repetition, yet evading review" exception to mootness. Pl. Opp. Mots. Dismiss 6-16, ECF 26. As discussed below, plaintiff Gonzales' facial challenge qualifies for the "capable of repetition, yet evading review" exception to mootness; however, plaintiff Marl's facial challenge and all of plaintiffs' as-applied challenges are moot.

**1. Legal Standard**

For a federal court to retain Article III jurisdiction, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (internal citation omitted). "The doctrine of mootness, which is embedded in Article III's case or controversy requirement, requires that an actual, ongoing controversy exist at all stages of federal court proceedings." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 862 (9th Cir. 2017) (citation omitted). A case becomes moot

[6] A hypothetical signature invalidity rate of 30% (5% above plaintiffs' estimated signature invalidity rate) would have invalidated 1,020 of the roughly 3,400 signatures submitted, leaving plaintiffs with 2,380 valid signatures—a figure that is just under the 2,400-signature threshold.

"when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam) (internal quotation marks omitted).

"The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Northwest Environmental Defense Center v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988). "An action 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Bayer*, 861 F.3d at 862 (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). In other words, the plaintiff must show he is "realistically threatened by a *repetition* of the violation." *Gest v. Bradbury*, 443 F.3d 1177 (9th Cir. 2006) (emphasis in original) (citation omitted).

Plaintiffs have raised both facial and as-applied challenges to defendant's enforcement of O.R.S. § 249.875. "[A] facial challenge is a challenge to an entire legislative enactment or provision." *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011). In contrast, "a paradigmatic as-applied attack . . . challenges only one of the rules in a statute, a subset of the statute's applications, or the application of the statute to a specific factual circumstance." *Id.* Importantly, these rules apply if and when a court reviews the substantive merits of plaintiffs' challenges. The mootness inquiry addresses an *a priori* question of whether this court has subject matter jurisdiction to consider plaintiffs' challenges.

**2. Nominal Damages and State Sovereign Immunity**

Plaintiffs acknowledge that they succeeded in recalling Holladay, but allege that their "prayer for nominal damages for a completed violation of a legal right prevents this case from becoming moot." Pl. First Supp. Br. 4 n.4, ECF 36; *see also* Pl. Opp. Mots. Dismiss 10-12, ECF 26. But, as discussed above, state sovereign immunity prevents any damages from being

assessed against defendant. "[S]tate sovereign immunity protects state officer defendants sued in federal court in their official capacities from liability in damages, *including nominal damages*." *Platt v. Moore*, 15 F.4th 895, 910 (9th Cir. 2021) (emphasis added).[7]

Plaintiffs cite to the Supreme Court's recent ruling in *Uzuegbunam*, 141 S. Ct. 792, in support of their mootness argument. *Uzuegbunam* involved a public university student who distributed religious literature and interacted with passersby at an on-campus plaza. *Id.* at 796. After being threatened with disciplinary action, the student sued the university for alleged First and Fourteenth Amendment violations, and sought a declaratory judgment and nominal damages. *Id.* at 797. During litigation, the university eliminated the challenged policies and then alleged the case was moot. *Id.* Despite these actions, the Supreme Court ruled that the request for nominal damages prevented the case from being mooted because the "prevailing rule, well established at common law, was that a party whose rights [were] invaded [could] always recover nominal damages without furnishing any evidence of actual damage." *Id.* at 800 (quotation marks omitted). Simply put, *Uzuegbunam* provides that even if an allegedly unconstitutional policy is eliminated during litigation, the constitutional challenge is not rendered moot because an award of nominal damages could still redress the past injury.

Here, the alleged violation began when Riggs set the 90-day period for signature collection. And the violation is not "complete" because the state law that requires the 90-day

[7] As the state suggests, this finding is also bolstered, in an alternative sense, when examined in the context of *Monell* liability. *See* State Supp. Br. 4, ECF 38. Under *Monell*, the court's task is to "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation." *Jett v. Dallas Independent School Dist*., 491 U.S. 701, 737 (1989); *see also McMillian v. Monroe Cty., Ala*., 520 U.S. 781, 785 (1997). In this case, Riggs possessed no "final policymaking authority"; the policy she was directed to adhere to was created by state officials.

collection period remains in effect. But that being said, *Uzuegbunam* offers little value to this dispute: while *Uzuegbunam* allows disputes to avoid mootness through the possibility of nominal damages, state sovereign immunity prevents *any* nominal damages from being assessed against defendant. Plaintiffs' claims are therefore moot, unless subject to the exception for being capable of repetition yet evading review, which is discussed next.

**3. Exception to Mootness: Capable of Repetition Yet Evading Review**

Plaintiffs allege that even if their challenge is moot, their claims remain live under the "capable of repetition, yet evading review" ("CRER") exception to mootness. The CRER exception applies only when (1) the duration of the challenged action is too short to allow for full litigation before the action ceases, and (2) there is a reasonable expectation that a plaintiff will face it again. *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1019 (9th Cir. 2010). To establish that a case is capable of repetition, a plaintiff must show that there is a "'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party." *Murphy*, 455 U.S. at 482 (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam)).

**a. First Prong: Duration of the Challenged Action**

The "duration of a challenged action is 'too short'" and satisfies the first prong of the CRER exception when the action "is almost certain to run its course before either [the Ninth Circuit] or the Supreme Court can give the case full consideration." *Johnson*, 623 F.3d at 1019 (quoting *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1173 (9th Cir. 2002)). The state notes that the doctrine "applies only in exceptional situations." State Mot. Dismiss 10, ECF 21 (quoting *Hamamoto v. Ige*, 881 F.3d 719, 722 (9th Cir. 2018)). But a closer examination of the term "exceptional situations" reveals that it tests whether the dispute is temporal in nature:

> Controversies that are not of inherently limited duration do not create "exceptional situations" justifying the rule's application, because, even if a particular controversy evades review, there is no risk that future repetitions of the controversy will necessarily evade review as well. As we have explained, "[t]he exception was designed to apply to situations where the type of injury involved inherently precludes judicial review, not to situations where . . . [review is precluded as a] practical matter."

*Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 837 (9th Cir. 2014) (quoting *Matter of Bunker Ltd. P'ship*, 820 F.2d 308, 311 (9th Cir. 1987)).

Cases related to elections "often fall within" the first prong of the CRER exception "because the inherently brief duration of an election is almost invariably too short to enable full litigation on the merits." *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003). The parties do not dispute that the duration of the challenged action is 90 days—the period plaintiffs had to collect a sufficient number of valid signatures. And the Ninth Circuit has made clear that "a maximum of 90 days to bring [a] lawsuit and make its way" through the judicial process "is insufficient to allow full review." *Am. C.L. Union of Nevada v. Lomax*, 471 F.3d 1010, 1017 (9th Cir. 2006); *see also Meyer v. Grant*, 486 U.S. 414, 417 (1988) (finding that a six-month period for proponents of an initiative to collect signatures satisfies the first prong because "the likelihood that a proponent could obtain a favorable ruling within that time, much less act upon such a ruling in time to obtain the needed signatures, is slim at best."). Therefore, plaintiffs' facial and as-applied challenges satisfy the first prong of the CRER exception.

**b. Second Prong, Facial Challenge: Likelihood of Repetition**

The second prong of the CRER exception requires plaintiffs to demonstrate that "there is a reasonable expectation that [they] will be subjected to [the challenged action] again." *Biodiversity Legal Found.*, 309 F.3d at 1173 (quoting *Greenpeace Action v. Franklin*, 14 F.3d

1324, 1329 (9th Cir. 1993)). "[T]he plaintiffs have the burden of showing that there is a reasonable expectation that they will once again be subjected to the challenged activity." *Lee v. Schmidt-Wenzel*, 766 F.2d 1387, 1390 (9th Cir. 1985). Once a plaintiff shows "that there is a reasonable expectation that they will once again be subjected to the challenged activity," the burden shifts to the defendant "to show that there is no reasonable expectation that the plaintiffs will be subjected to the same action again." *Id.*; *Johnson*, 623 F.3d at 1020.

In their First Amended Complaint, plaintiffs Gonzales and Marl suggested that continued enforcement of the 90-day collection period would affect their intent "to participate in future recall petition campaigns at the local, county, regional, and state levels." First Am. Compl. ¶¶ 3-4, ECF 19. When asked to further explain these plans, plaintiff Gonzales informed the court of her intent "to file a recall petition against an elected Oregon City official in 2022, or as soon as this litigation is concluded." Pl. First Supp. Br. 7, ECF 36; *see also* Second Am. Compl. ¶ 10, ECF 42.[8] Meanwhile, plaintiff Marl, who is an elected official, stated his intent to participate in a "2022 Oregon recall effort" in a professional or volunteer capacity, but declined to identify a specific official or that official's level of government (local, state, or federal) to preserve his existing working relationships. *See* Second Am. Compl. ¶ 11, 11 n.4, ECF 42. Plaintiffs posit that this clarification is sufficient to demonstrate a "reasonable expectation that the same complaining party [will] be subjected to the same action again." Pl. First Supp. Br. 7, ECF 36 (quoting *Meyer*, 486 U.S. at 417 n.2).

The state counters with three arguments. First, the state alleges that plaintiffs "fail[] to adequately allege that they will suffer any particularized injury in [any future] petition effort."

[8] Plaintiff Gonzales also alleged that she will seek the recall of non-Oregon City-affiliated officials, including two Clackamas County commissioners. *See* Second Am. Compl. ¶ 10, ECF 36-1.

State First Supp. Br. 6, ECF 38. However, the second prong of the CRER analysis only requires that "the same complaining party [] be subjected to the same action again." *Weinstein*, 423 U.S. at 149. Here, plaintiffs Gonzales and Marl have plausibly alleged their respective intentions to participate in an Oregon recall effort in 2022 or at the conclusion of this litigation.[9] Pl. First Supp. Br. 7, ECF 36; *see also* Second Am. Compl. ¶¶ 10-11, 11 n.4, ECF 42. Defendant has not given any indication that he will refrain from applying the 90-day signature collection period that is the subject of this constitutional challenge. Thus, plaintiffs Gonzales and Marl hold a reasonable expectation that their recall plans will be subjected to the same challenged activity—the imposition of the 90-day signature collection period.

Second, the state relies on a quote from *Schmidt-Wenzel* to argue that the court "must consider whether the anticipated future litigation will involve the same defending party as well as the same complaining party." State Mot. Dismiss 8-9, ECF 21 (quoting *Schmidt-Wenzel*, 766 F.2d at 1390); *see also* State First Supp. Br. 6 n.3, ECF 38 (alleging the same). More specifically, the state alleges that any future injury related to the enforcement of a 90-day deadline "cannot be traced to defendant *Riggs* nor is it redressable through a judgment against *her*." *Id.* at 9 (emphasis added).

But the *Schmidt-Wenzel* quote offered by the state does not support such a proposition. The pertinent portion of the opinion states:

> The exception to mootness for those actions that are capable of repetition, yet evading review, usually is applied to situations involving governmental action where it is feared that the challenged action will be repeated. The defending party being constant, the emphasis is on continuity of identity of the complaining party. *When the litigation is between private parties, we must consider whether the anticipated future litigation will involve the same defending party as well as the same complaining party*. In order to apply the "capable of repetition" doctrine to

---

[9] While plaintiff Marl's intent to recall an unspecified Oregon official survives this analysis, his claim, as discussed below, does not otherwise qualify for the CRER exception.

> private parties, there must be a reason to expect that there will be future litigation of the same issue between a present complaining party and a present defending party.

*Schmidt-Wenzel*, 766 F.2d at 1390 (emphasis added). When the quoted language is read in its proper context, *Schmidt-Wenzel* advances the incontrovertible principle that a dispute *between private parties* should involve identical complainants and defendants to be capable of repetition, yet evading review.[10] *Id.* Importantly, the panel distinguished a private dispute from one involving governmental actors, suggesting that CRER challenges against government action do not require the exact same *official* because the defending party, i.e., the government entity, remains "constant." *Id.* Thus, at a minimum, plaintiff Gonzales' dispute meets the second prong of the CRER exception, as she plans to recall an Oregon City official and thus would face the same defending party, the City Recorder of Oregon City.

Third, the state alleges that any intentions to recall non-Oregon City officials, such as Clackamas County Commissioners, cannot be considered CRER because the presumed injury—an imposition of a 90-day signature collection deadline—would be inflicted by elections offices that are absent from the present dispute. *See* State Reply Mot. Dismiss 6, ECF 27 (listing cases suggesting that remedies can only be imposed on specific parties to the action). Plaintiffs counter this argument by offering three Ninth Circuit cases suggesting, but not definitively

---

[10] Indeed, *Schmidt-Wenzel* involved a dispute between private parties—specifically, members of a private bank's board of directors. 766 F.2d at 1388. The dispute arose when a majority of a quorum of directors attending a meeting (but not a majority of the total number of directors) filled all the vacant seats on the board. *Id.* at 1388-89. Three disgruntled directors filed suit, alleging that the new directors were improperly appointed because they lacked approval from a majority of all existing directors. *Id.* at 1389. Over the course of litigation, the new directors were judicially restrained from taking any action and then agreed to step down, thus mooting the dispute. *Id.* In declining to apply the CRER doctrine to revive the dispute, the *Schmidt-Wenzel* court noted that it was highly unlikely that a similar scenario involving the same private defendants (who chose to press forward in filling board seats) would happen again. *Id.* at 1390-91. These facts are completely different and distinguishable from the current dispute.

holding, that a dispute is capable of repetition "even when the future hypothetical elections officer is unknown." Pl. First Supp. Br. 8, ECF 36.

In the absence of a dispositive case on this specific issue, the existing caselaw provides the state with the upper hand. First, *Schmidt-Wenzel* suggests that the CRER exception is often granted in litigation against governmental entities because "[t]he defending party [is] constant." 766 F.2d at 1390. That principle expressly relies on the continuity of a particular elections office; *ergo,* that continuity disappears when other elections offices that are not involved in the present action are implicated in a future action. Second, a future injunction in this matter could only bind the actions of the named defendants—in this case, the City Recorder of Oregon City. *See Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) ("If a case for preventive relief be presented, the court enjoins, in effect, not the execution of the statute, but the acts of the official, the statute notwithstanding."). Conversely, a hypothetical threat of future injury by a non-party—for example, the individual who runs elections in Clackamas County—could not be redressed by an injunction in the present case. Both of these reasons caution against finding that a dispute is capable of repetition, yet evading review when the hypothetical threat of repeated injury comes from a completely different governmental entity.

The three cases plaintiffs offer do not dislodge this principle. While plaintiffs posit that the cases demonstrate the CRER exception can exist "even when the future hypothetical elections offer is unknown," each of the defending parties in those cases held enforcement authority over the action that was allegedly capable of repetition. Pl. First Supp. Br. 8, ECF 36. In *Wolfson v. Brammer*, a candidate for judicial office challenged the constitutionality of certain sections of the Arizona Code of Judicial Conduct ("ACJC"). 616 F.3d 1045, 1051-52 (9th Cir. 2010). The named defendants either enforced or were involved in the enforcement of the ACJC,

and thus offered a constant defending party on which a CRER exception could be based. *Id.* at 1051. Similarly, in *International Organization of Masters, Mates & Pilots v. Brown*, a plaintiff challenged the union's denial of his request to send campaign literature to voters before a union election. 498 U.S. 466, 469-71 (1991). The union, which was named as defendant, ran the very election that the plaintiff wished to participate in. *Id.* at 469. And in *Schaefer v. Townsend*, a prospective congressional candidate challenged the constitutionality of a state statute that required candidates to reside in the district they sought election in *at the time* they filed nomination papers. 215 F.3d 1031, 1032 (9th Cir. 2000). One of the named defendants was the California Secretary of State, an official who was tasked with overseeing all federal and state elections within the state. *Id.* In short, all of plaintiffs' cases are consistent with the state's interpretation, which disqualifies plaintiff Gonzales' intention to recall Clackamas County Commissioners and plaintiff Marl's unspecified intentions of participating in Oregon recall elections from the CRER exception.

Thus, only plaintiff Gonzales' intention "to file a recall petition against an elected Oregon City official in 2022, or as soon as this litigation is completed" satisfies the second CRER prong. Second Am. Compl. ¶ 10, ECF 42. As such, her facial challenge qualifies for the "capable of repetition, yet evading review" exception to mootness. *Schmidt-Wenzel*, 766 F.2d at 1390; *see also Fed. Election Comm'n v. Wis. Right To Life, Inc.,* 551 U.S. 449, 463-64 (2007) (finding that plaintiff had a "reasonable expectation" of self-censorship because it "credibly claimed" that it planned to perform "materially similar" actions in the future and there was "no reason to believe that [the defendant] would refrain from" similar prosecution) (quotation marks omitted).

**c. Second Prong, As-Applied Challenge: Likelihood of Repetition**

On the other hand, all of plaintiffs' as-applied challenges do not meet the CRER exception's second prong because they have not demonstrated a reasonable expectation that circumstances materially similar to those that spurred this lawsuit will recur. To be clear, a plaintiff alleging an as-applied challenge does not need to demonstrate that the same controversy will recur "down to the last detail." *Wis. Right to Life*, 551 U.S. at 463. But a plaintiff does need to prove that "there is a reasonable expectation or a demonstrated probability that 'materially similar' circumstances will recur." *People Not Politicians Oregon v. Fagan*, No. 6:20-CV-01053-MC, 2021 WL 2386118, at *1 (D. Or. June 10, 2021) (quoting *id.*).

Plaintiffs' as-applied challenges arise from a combination of "the public health emergency created by the COVID-19 pandemic" and the "impacts of the September 2020 regional fires, smoke, and related evacuations." Second Am. Compl. ¶¶ 53, 57, ECF 42. Plaintiffs offer two points to justify their "reasonable expectation" that this unfortunate combination will recur. Pl. First Supp. Br. 10. ECF 8. First, they suggest that in a pandemic where "the only certainty is uncertainty," the burden of proof ought to be shifted "to *defendant* to prove that COVID-19 will not negatively impact" their intended recall efforts. *Id.* at 10-11 (emphasis in original). Second, they argue that "almost all recent modeling indicates that more of Oregon will burn in the coming years," and point to projections suggesting a continued statewide increase in summer temperatures and large wildfires through 2050. *Id.* at 11.

Plaintiffs' arguments do not create a reasonable expectation that their future recall efforts "*will* be subject to the same action again." *Wis. Right to Life*, 551 U.S. at 463 (quotation omitted) (emphasis added). Of course, there always is a possibility "that the unique convergence of factors that led to [p]laintiffs' initial challenge *could* recur." *Fagan*, 2021 WL 2386118 at *3

(emphasis in original). But facts in the public record render plaintiffs' claim highly speculative. Although the exact specifics surrounding the future of the pandemic are uncertain, recent public health measures, including a significant increase in vaccination rates and the lifting of the statewide mask mandate, suggest that the COVID-related difficulties that existed during plaintiffs' first signature collection effort will not recur in 2022.[11] And while wildfires will likely continue to affect Oregon summers for decades to come, plaintiffs' evidence does not sufficiently demonstrate that the time, location, and severity of any destructive wildfires would undermine their future attempts to recall Oregon City officials. While plaintiffs ask the court to foresee a scenario where signature collection is significantly hampered by both devastating wildfires and crippling restrictions from the COVID-19 pandemic, this court declines to serve as "an oracle of speculation." *Id.* at *1. Accordingly, plaintiffs' as-applied challenges are not capable of repetition and remain moot.

In sum, plaintiff Gonzales' facial challenge relating to her intent to recall an Oregon City official qualifies for the "capable of repetition, yet evading review" exception to mootness, while plaintiff Marl's facial challenge and all of plaintiffs' as-applied challenges are moot.

## V. Alternatives to Review on the Merits: *Pullman* Abstention and Certification to the Oregon Supreme Court

The parties have also offered alternatives to adjudicating the merits of plaintiff Gonzales' surviving claim. The state argues that *Pullman* abstention is warranted. State Mot. Dismiss 15, ECF 21. Plaintiffs originally did not dispute that *Pullman* abstention was appropriate as a matter

---

[11] Moreover, plaintiffs' awareness of the pandemic and wildfire-related restrictions places them in a different position when preparing for a future recall election cycle (as compared to the 2020 elections cycle). With roughly two years of experience in the pandemic, plaintiffs are far better positioned to employ alternative signature-collecting methods to collect a sufficient number of signatures and trigger a recall election.

of law. *See* Pl. Opp. Mots. Dismiss 17, ECF 26 ("[T]he State, in suggesting a *Pullman* stay, is not entirely wrong. Plaintiffs' state court claims *would* be appropriate[ly] resolved by an Oregon state court.") (emphasis in original). Instead, they initially opposed abstention for two reasons: (1) they alleged the state's request for *Pullman* was improperly raised, and (2) they argued that certifying the underlying constitutional question to the Oregon Supreme Court is a superior alternative to abstention. *Id.* After the court informed the parties of its concern regarding invoking *Pullman* abstention in disputes involving the First Amendment, *see* ECF 47, plaintiffs updated their position to include the general rule that "*Pullman* abstention is inappropriate in First Amendment cases." Pl. Second Supp. Br. 7, ECF 51. For reasons described below, neither the state's request for *Pullman* abstention nor plaintiffs' request for certification to the Oregon Supreme Court are appropriate here.

**A. Appropriateness of Request for *Pullman* Abstention**

Plaintiffs allege the state, as a procedural matter, has "inappropriately" requested *Pullman* abstention. Pl. Opp. Mots. Dismiss 17, ECF 26. First, they remark that "the State filed a motion to dismiss, not a motion to stay." *Id.* This argument is unpersuasive for a number of reasons. First, as a technical matter, *Pullman* abstention requires both a dismissal and a stay: when the court applies *Pullman* abstention, it stays any questions under federal law and dismisses the state law questions for disposition in state court. *See Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 807 (9th Cir. 2001) (remanding to dismiss state law claims on *Pullman* abstention grounds). Second, while the state's request for abstention was preceded by nearly fifteen pages of argument seeking dismissal for lack of subject-matter jurisdiction, that prerequisite must be met before the court even contemplates abstention. *See generally* State

Mot. Dismiss 1-15, ECF 21. And third, plaintiffs' argument ignores the state's forthright explanation of the procedure within its motion:

> When a plaintiff brings challenges under the U.S. and a state constitution, the federal court should … stay[] its hand while the parties repair[] to the state courts for a resolution of their state constitutional questions." *Reetz*, 397 U.S. at 87 (citing *Railroad Comm'n of Texas v. Pullman Co*., 312 U.S. 496 (1941) ("*Pullman*")).

*Id.* at 15-16. Thus, it is appropriate for the court to consider the state's request for *Pullman* abstention.

Plaintiffs also claim that the state and defendant violated this court's conferral obligations by failing to disclose its argument involving *Pullman*. Pl. Opp. Mots. Dismiss 23, ECF 26. Local Rule 7-1(a) requires all parties to confer and "discuss each claim, defense, or issue" that is the subject of a dispositive motion. Counsel for the state disputes plaintiffs' representation, recalling that during their first conversation, he "discussed multiple abstention doctrines, including *Pullman*." Marshall Decl. ¶ 2, ECF 28.

The parties' submissions suggest the *Pullman* argument has been properly raised. The exhibits demonstrate that at a minimum, the state disclosed an intent to plead an argument involving abstention during its first conferral meeting, held on February 19, 2020. *Id.* at 3-4 (plaintiffs' counsel alleging that the state's attorney mentioned *Thibodeaux* abstention, but not *Pullman* abstention, during their first conferral). Roughly two weeks after that meeting, the state filed an answer that asserted both *Pullman* and *Thibodeaux* as affirmative defenses. *See* State Ans. ¶¶ 9-10, ECF 18-1. The parties then attempted to confer again on March 24, 2020, but their phone call was hampered by poor cell service experienced by the state's counsel. When asked by the state's counsel if "there was more to talk about," plaintiffs' counsel wrote:

> No worries, I know the cell service [at the attorney's location] is awful. I'm surprised we got to talk for as long as we did without the line going dead.

> Anyway, I think you've fulfilled your conferral requirement. I'm sure we could geek out ad nauseam about these issues, but you're on spring break and I have deadlines to meet. ;)

Marshall Decl., Ex. 1 at 6-7, ECF 28-1. These exhibits demonstrate that even if the state's counsel failed to disclose the possibility of *Pullman* abstention during their first meeting, plaintiffs' counsel declined to seek further elaboration after their second meeting, which occurred after the state filed an affirmative response invoking *Pullman*. Thus, the state met its conferral obligations in disclosing the potential of a *Pullman* abstention argument.

### B. *Pullman* Abstention: Legal Standard and Analysis

"*Pullman* abstention is an extraordinary and narrow exception to the duty of a district court to adjudicate a controversy." *Courthouse News Serv. v. Planet,* 750 F.3d 776, 783 (9th Cir. 2014) (quoting *Wolfson*, 616 F.3d at 1066). Abstention under *Pullman* is appropriate only when:

> (1) the case touches on a sensitive area of social policy upon which the federal courts ought not enter unless no alternative to its adjudication is open, (2) constitutional adjudication plainly can be avoided if a definite ruling on the state issue would terminate the controversy, and (3) the proper resolution of the possible determinative issue of state law is uncertain.

*Id.* at 783-84 (quoting *Porter*, 319 F.3d at 492). Moreover, the Supreme Court has emphasized that *Pullman* abstention "is not to be ordered unless the [state] statute is of an uncertain nature, and is obviously susceptible of a limiting construction." *Id*. Thus, for *Pullman* abstention to be warranted, there must be an ambiguity in state law and it must be of a type that a clarifying construction could eliminate the need to reach a constitutional issue, or at least alter it substantially. *Trees v. Serv. Emps. Int'l Union Loc. 503*, No. 6:21-CV-468-SI, 2021 WL 5829017, at *7 (D. Or. Dec. 8, 2021).

Here, it is undisputed that the latter two factors are easily met. The parties agree that if a state court found that the 90-day signature deadline violated the state constitution, a court would

not need to reach the federal constitutional issue. The parties also agree that no Oregon court has determined whether the 90-day deadline violates the state Constitution, and thus plaintiffs' challenge presents "novel and uncertain questions of state law." *Columbia Basin*, 268 F.3d at 806. But the first factor is on less firm ground: while this case implicates the right of recall within the Oregon Constitution—a right enshrined to Oregonians with no parallel or analogous provision within the U.S. Constitution—it features rights associated with the circulation of petitions, an act described as "core political speech . . . protected by the First Amendment." *Prete v. Bradbury*, 438 F.3d 949, 961 (9th Cir. 2006).

The state also alleges that this dispute involves another issue that warrants abstention: "*Pullman* [] is appropriate [when] the state's constitution contains a provision unlike any in the federal constitution[,] and state court construction of its unclear or ambiguous clause might make a federal ruling unnecessary." *Ellis v. City of La Mesa*, 990 F.2d 1518, 1522 (9th Cir. 1993) (citing *Reetz v. Bozanich*, 397 U.S. 82, 90 (1970)). In other words, "abstention is particularly appropriate" when a case "implicates a state constitution provision that differs significantly from" a federal constitutional provision. *Columbia Basin*, 268 F.3d at 806 (citing *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 237 n.4 (1984)).

It is true that plaintiffs' suit *implicates* Article II, Section 18 of the Oregon Constitution. That provision, which sets out methods for removing Oregon officials, is clearly not the "parallel state constitutional provision" of the First Amendment, which generally protects the right to free speech and political expression. *Midkiff*, 467 U.S at 237 n.4. But the target of plaintiffs' suit is O.R.S. § 249.875, which is a state statute, not a provision of the Oregon Constitution. Moreover, the state has not explained the existence of any "unclear or ambiguous clause" in either Article II, Section 18 of the Oregon Constitution or O.R.S. § 249.875; if anything, it concedes that the

state "statute is clear that recall petitions must be submitted within 90 days." *Ellis*, 990 F.2d at 1522; State Second Supp. Br. 7, ECF 49. Thus, the state's proffered justifications for *Pullman* abstention are, at best, quite murky.

Additionally, "*Pullman* abstention 'is generally inappropriate when First Amendment rights are at stake.'" *Planet*, 750 F.3d at 784 (quoting *Wolfson*, 616 F.3d at 1066). A thorough examination of the Ninth Circuit's jurisprudence reveals three independent reasons for this. First, the *Pullman* requirement that necessitates "a sensitive area of social policy upon which the federal courts ought not enter" is "almost never" satisfied in First Amendment cases "because the guarantee of free expression is always an area of particular federal concern." *Ripplinger v. Collins*, 868 F.2d 1043, 1048 (9th Cir. 1989). Second, "there is a risk in First Amendment cases that the delay that results from abstention will itself chill the exercise of the rights that the plaintiffs seek to protect by suit." *Porter*, 319 F.3d at 487. And third, "constitutional challenges based on the [F]irst [A]mendment right of free expression are the kind of cases that the federal courts are particularly well-suited to hear." *Id.* (quoting *J–R Distribs., Inc. v. Eikenberry*, 725 F.2d 482, 487 (9th Cir. 1984), *overruled on other grounds by Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985)).

Of course, the Ninth Circuit's rule is a "general[]" one, and "there is no absolute rule against abstention in [F]irst [A]mendment cases." *Planet*, 750 F.3d at 784 (quoting *Wolfson*, 616 F.3d at 1066); *Almodovar v. Reiner*, 832 F.2d 1138, 1140 (9th Cir. 1987). But examples of successful deviation are few and far between. As the *Porter* panel recognized, "the only First Amendment case in which [the Ninth Circuit has] found that *Pullman* abstention was appropriate"—the aforementioned *Almodovar* case—"involved an unusual procedural setting; the issue in question was already before the state supreme court." 319 F.3d at 493-94. That

particular facet of *Almodovar* made *Pullman* abstention palatable because it rendered the "delay that is particularly pernicious in First Amendment cases [] not an issue." *Id.* at 494; *see also Almodovar*, 832 F.2d at 1140 ("[T]he litigants need not undergo the expense or delay of a full state court litigation because other parties are already presenting the issue to the California Supreme Court."); *Lomma v. Connors*, 539 F. Supp. 3d 1094, 1100-01 (D. Haw. 2021) ("Here, [the litigants] are parties to [a similar proceeding in state court], which is currently before the [Hawai'i Intermediate Court of Appeals], rendering abstention particularly compelling."). Such a situation is not present here, as the parties have not informed this court of any ongoing state court litigation, and for reasons explained below, certification of an underlying constitutional question to the Oregon Supreme Court is inappropriate in this case.

The analysis thus reduces to a straightforward question: do plaintiffs allege a violation of the First Amendment related to free expression? The answer is yes. *See* Second Am. Compl., ECF 42, at ¶¶ 48-50 (invoking First Amendment protections associated with speech and political expression); ¶¶ 54-58 (specific claims alleging facial and as-applied violations of the First and Fourteenth Amendments). And while the state may argue that the central dispute in this case is rooted within Oregon's values concerning self-governance, "constitutional challenges based on the [F]irst [A]mendment right of free expression are the kind of cases that the federal courts are particularly well-suited to hear." *Porter*, 319 F.3d at 487. Moreover, the nature of plaintiffs' lawsuit is tied to the First Amendment, as "the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech'"—"an area of public policy where protection of robust discussion is at its zenith." *Meyer*, 486 U.S. at 421-22, 425 (quoting *Grant v. Meyer*, 828 F.2d 1446, 1456-57 (10th Cir. 1987), *aff'd*, *id.*); *see also Prete*, 438 F.3d at 961 (quotation marks omitted) ("[T]he

circulation of initiative and referendum petitions involves core political speech, and is, therefore, protected by the First Amendment.").

Plaintiffs' federal claims also require resolution in this court, as opposed to abstention, to avoid "the delay that results from abstention[, which] chill[s] the exercise of the rights that the plaintiffs seek to protect by suit." *Porter*, 319 F.3d at 487. One district court has described this aspect of the Ninth Circuit's jurisprudence as the "animating reason behind courts' reluctance to abstain in cases implicating First Amendment rights." *Olson v. Bynum*, No. 220CV2481TLNKJNPS, 2022 WL 2052696, at *7 (E.D. Cal. June 7, 2022). And while the court in *Olson* found that the "animating reason" was not present for a plaintiff who conditioned her *as-applied* challenge with a stipulation that "she has no impending plans to seek public office," it certainly exists for plaintiff Gonzales' remaining *facial* challenge, as she plans "to file a recall petition against an elected Oregon City official in 2022, or as soon as this litigation is completed." *Id.*; Second Am. Compl. ¶ 10, ECF 42.

The state objects to this analysis and offers numerous responses in support of *Pullman* abstention. First, it argues that "[p]laintiffs seek a right to govern, not a right to speak," and thus, "nothing about this case would discourage" the exercise of their First Amendment rights. State Second Supp. Br. 2-3, ECF 49. But regardless of how the state wishes to characterize plaintiffs' motives, the circulation of petitions is "protected by the First Amendment." *Prete*, 438 F.3d at 961. And while this case does indeed "concern recalls, which are creatures of state law and to which there is no federal constitutional right," State Second Supp. Br. 4, ECF 49, and there is no explicit "First Amendment right to place an initiative on the ballot," *Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012) (noting that there is no explicit "First Amendment right to place an initiative on the ballot"), the right to circulate initiatives is protected as core political speech.

*Meyer*, 486 U.S. at 422 (recognizing that the "circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech'").

Second, the state, citing *Smelt v. Cnty. of Orange*, 447 F.3d 673 (9th Cir. 2006), argues that "when a plaintiff's First Amendment claim is doubtful, the Ninth Circuit has overcome its reluctance to abstain." State Second Supp. Br. 33, ECF 49. It is true that the *Smelt* panel chose to abstain despite the plaintiffs' claim that the "case touche[d] upon First Amendment issues." 447 F.3d at 681 n.22. But the *Smelt* panel made this decision with the combination of two factors in mind: (1) "it is difficult, or impossible, to see a true speech problem . . . [a]ll that is involved here is the failure to issue a marriage license," and (2) "state litigation on the issues is already well underway." *Id.* Neither of these considerations are present here, as the circulation of petitions is far closer to the First Amendment than the issuance of a marriage license, and there is no ongoing state litigation for the issues raised in this suit.

Third, the state frames the dispute as "fundamentally an election law case, not a free expression case." State Second Supp. Br. 4, ECF 49 (citing *Badham v. U.S. Dist. Ct. for N. Dist. of California*, 721 F.2d 1170, 1172 (9th Cir. 1983)). While the *consequence* of plaintiffs' suit may implicate an election, that does not necessarily make it an election law case. Rather, the central remaining claim is one involving the right of citizens to engage in "core political speech" by circulating petitions with fellow residents. *Prete*, 438 F.3d at 961; *John Doe No. 1 v. Reed*, 561 U.S. 186, 195 (2010) ("Petition signing remains expressive even when it has legal effect in the electoral process.").

Fourth, the state attempts to distinguish the instant case from the facts in *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520 (9th Cir. 2015), a ballot access

case where the Ninth Circuit rejected the use of *Pullman* abstention. State Second Supp. Br. 4 n.5, ECF 49. At issue there was whether city laws requiring that (1) proponents of a ballot measure be natural persons and (2) the name of proponents appear on petitions circulated to voters, violated the First Amendment. *Chula Vista*, 782 F.3d at 524. As the state notes, the *Chula Vista* panel declined *Pullman* abstention for two reasons: (1) the enforcement of the challenged state statute was not ambiguous, and (2) abstention is "strongly disfavored in First Amendment cases." *Id.* at 528. Yet both of those reasons are present here: the state itself has acknowledged that O.R.S. § 249.875(1) is "clear that recall petitions must be submitted within 90 days," State Second Supp. Br. 7, ECF 49, and plaintiffs' claims, at minimum, invoke protections associated with core political speech.

Lastly, the state suggests that the present situation is distinct because plaintiffs "assert a separate state constitutional claim which, if successful, would terminate the controversy." State Second Supp. Br. 5, ECF 49. It is indeed true that in such situations, *Pullman* abstention is favorable to give state courts the first attempt at resolving such an issue. But "abstention [is] inappropriate in a [F]irst Amendment case, even where the state court had not had an opportunity" to weigh in and potentially narrow or strike the issue altogether. *Ripplinger*, 868 F.2d at 1049. Said otherwise, a "possibility that [a state] court might render adjudication of the federal question unnecessary does not require *Pullman* abstention." *Polykoff v. Collins*, 816 F.2d 1326, 1334 (9th Cir. 1987). Given all these concerns, particularly plaintiffs' invocation of an action protected by the First Amendment, *Pullman* abstention is not appropriate here.

### C. Certification to the Oregon Supreme Court

Plaintiffs suggest that instead of abstaining under *Pullman*, the court should certify the underlying state law constitutional question to the Oregon Supreme Court. Specifically, plaintiffs seek to certify the following question:

> ORS 249.875(1) contains a 90-day limitation for gathering recall petition signatures. Is that statute facially invalid under the Oregon Constitution, and particularly Article II, section 18?

Pl. Mot. Cert. i, ECF 43. Plaintiffs offer two justifications for this approach: first, "[d]irect certification would avoid the potential[] years of delay and expense" associated with *Pullman* abstention, and second, the Oregon Supreme Court is the "best qualified" entity to answer the parties' "purely legal question." Pl. Opp. Mots. Dismiss 18, ECF 26.

But this court must first determine whether it has the authority to even certify plaintiff's requested question to the Oregon Supreme Court. Notably, the Eleventh Amendment and the Supreme Court's decision in *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984), provides a significant obstacle to plaintiffs' motion for certification. As the Supreme Court wrote in *Pennhurst*:

> This need to reconcile competing [federal and state] interests is wholly absent, however, when a plaintiff alleges that a state official has violated state law. . . . A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

*Pennhurst*, 465 U.S. at 106. Plaintiffs' remaining state law claim, in essence, asks this court to provide relief that *Pennhurst* expressly cautions against: "instruct[ing] a state official[] on how to conform their conduct to state law." *Id.*

Three core questions must be addressed before applying *Pennhurst*: (1) did defendant properly raise *Pennhurst*; (2) is defendant a "state official"; and (3) does *Pennhurst* require that a state law claim be dismissed rather than having an underlying constitutional question certified to a state's highest court? All three questions are answered in the affirmative here.

On the first question, plaintiffs allege that the state "improperly" used its opposition to their motion for certification to "bolster its arguments in favor of dismissal" instead of "address[ing] the merits of the certification motion." Pl. Reply Mot. Cert. 1-2, ECF 46. But the state asserted *Pennhurst* against plaintiffs' state law claims in its prior briefing. *See* State's Mot. Dismiss 24-25, ECF 21; State Reply Mot. Dismiss 21, ECF 27; State's Supp. Br. 8, ECF 38. And in any event, this court has "an 'independent obligation to examine [its] own jurisdiction'" even if an issue is not raised by the parties. *United States v. McIntosh*, 833 F.3d 1163, 1173 (9th Cir. 2016) (quoting *United States v. Hays*, 515 U.S. 737, 742 (1995)); *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.,* 810 F.2d 869, 873 n.2 (9th Cir. 1987) ("The Eleventh Amendment may be described as either creating an immunity for states or establishing a jurisdictional limitation on federal courts. . . . Like a jurisdictional bar and unlike a traditional immunity, however, the effect of the Eleventh Amendment must be considered *sua sponte* by federal courts.").

The second question—whether defendant or his predecessor are considered "state officials" for purposes of *Pennhurst*—is also answered in the affirmative. As discussed earlier in the context of state sovereign immunity, Riggs was acting as a state official when she enforced the 90-day deadline contained in O.R.S. § 249.875. *Ante* at 6-9; *see, e.g., Weiner v. San Diego Cty.,* 210 F.3d 1025, 1029-31 (9th Cir. 2000) (holding that California district attorneys are considered state officers when deciding to prosecute an individual). Thus, this court, under

*Pennhurst*, cannot instruct defendant or his predecessor "on how to conform their conduct to state law," as doing so "conflicts directly with the principles of federalism that underlie the Eleventh Amendment." 465 U.S. at 106. It is for this reason that the court also cannot exercise *supplemental* jurisdiction over plaintiffs' remaining state law claim, as "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment." *Id.* at 121.

Finally, the remaining question is whether *Pennhurst*, which strips this court of jurisdiction to enforce state law claims against defendant, prevents this court from certifying a question of state law based on that claim to the Oregon Supreme Court. The answer is yes: "[i]f jurisdiction is lacking at the outset, the district court has no power to do anything with the case except dismiss." *Morongo Band of Mission Indians v. California State Bd. of Equalization*, 858 F.2d 1376, 1380 (9th Cir. 1988); *see also Arizona State Bldg. & Constr. Trades Council v. Brnovich*, No. CV-17-04446-PHX-ROS, 2019 WL 1130005, at *4 (D. Ariz. Mar. 12, 2019) ("Certification is not appropriate, however, when a court lacks jurisdiction to hear the claim at issue."); *Mascheroni v. Bd. of Regents of Univ. of California*, 28 F.3d 1554, 1557 (10th Cir. 1994) (concluding that because "the Eleventh Amendment bars [plaintiff's] state law claims in federal court . . . [the Tenth Circuit panel] and the district court lack jurisdiction . . . to certify this question to the New Mexico Supreme Court").[12] This court has no authority to certify a

[12] Two of these cases, *Brnovich* and *Mascheroni*, appeared in the state's opposition to plaintiff's motion for certification; plaintiffs ask the court to not evaluate these cases because they fail to address "the merits of the certification motion." Pl. Reply Mot. Cert. 1-2, ECF 46. But as stated earlier, this court has an independent obligation to check for jurisdiction throughout the litigation process. In any event, even if the court was somehow barred from considering these cases, it would still rule the same way based on the Ninth Circuit's decision in *Morongo Band of Mission Indians v. California State Bd. of Equalization*, 858 F.2d 1376 (9th Cir. 1988).

question that stems from a state law claim over which it has no jurisdiction. Accordingly, plaintiffs' motion to certify a question to the Oregon Supreme Court must be denied.

To summarize the analysis so far: plaintiffs originally brought suit alleging facial and as-applied violations of the First and Fourteenth Amendments and the Oregon Constitution, and sought declaratory and injunctive relief, nominal damages of one dollar, and litigation expenses. Plaintiffs, however, can only obtain future injunctive relief, as a declaratory judgment and money damages against defendant are unavailable because of state sovereign immunity. Moreover, because plaintiffs ultimately succeeded in qualifying for a special election, their claims for relief are moot; only plaintiff Gonzales' facial challenge qualifies for the capable-of-exception, yet evading review exception to mootness. As an alternative to analyzing plaintiff Gonzales' facial challenges, the state suggests that *Pullman* abstention is proper, while plaintiffs recommend certifying an underlying state law question to the Oregon Supreme Court. But *Pullman* abstention is not advisable in cases involving core First Amendment rights, and *Pennhurst* forces this court to dismiss the remaining state law claims, preventing any certification to the Oregon Supreme Court. The analysis now proceeds on the sole remaining claim: plaintiff Gonzales' facial challenge, based on the First and Fourteenth Amendments, to the enforcement of O.R.S. § 249.875.

## VI. Facial Challenge, First Amendment

Plaintiffs allege that "the 90-day signature gathering limitation contained in ORS 249.875(1) unduly burdens core political speech and is facially invalid under the First and Fourteenth Amendments." Second Am. Compl. ¶ 55, ECF 42. As a reminder, the Fourteenth Amendment claim is not a standalone argument, but rather, a means of incorporating the First

Amendment's protections to state and local governments. *Nordyke v. Santa Clara Cty.*, 110 F.3d 707, 710 (9th Cir. 1997).

**A. Legal Standard**

The parties disagree on what legal standard plaintiff Gonzales' First Amendment claim should be analyzed under. In their Second Amended Complaint, plaintiffs invoke a pair of overlapping federal frameworks: the *Anderson-Burdick* sliding scale test and the Ninth Circuit's *Angle* framework. Second Am. Compl. ¶ 50, ECF 42. The state argues that the *Angle* framework is not "the correct legal standard" and that "[r]ecent case law has further undermined" its use, but does not clearly offer an alternative standard (instead implicitly suggesting the automatic use of rational basis review). State Reply 18, ECF 27.

To start, there exists "an inevitable tension between a state's authority and need to regulate its elections and the First and Fourteenth Amendment rights of voters, candidates, and political parties." *Arizona Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019) (citing *Storer v. Brown*, 415 U.S. 724, 729-30 (1974)). Federal courts balance these competing interests by employing a "flexible standard" ("*Anderson–Burdick*") established in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and refined in *Burdick v. Takushi*, 504 U.S. 428 (1992), for reviewing such challenges. *Burdick*, 504 U.S. at 434. When applying the *Anderson-Burdick* standard, courts weigh the character and magnitude of the asserted injury to the plaintiff's First Amendment rights against the interests offered by the state as justifications for the burden imposed by the rule, while also considering the extent to which the state's interests make it necessary to burden the plaintiff's rights. *Id.* The Ninth Circuit has characterized this approach as a "sliding scale":

> [T]he more severe the burden imposed, the more exacting our scrutiny; the less severe, the more relaxed our scrutiny. To pass constitutional muster, a state law imposing a severe burden must be narrowly tailored to advance "compelling" interests. On the other hand, a law imposing a minimal burden need only reasonably advance important interests.

*Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019) (citations and quotation marks omitted).

Roughly two decades after the Supreme Court's *Burdick* decision, the Ninth Circuit suggested the existence of a limited variation to the sliding scale analysis: the *Angle* framework. The plaintiffs in *Angle* argued that Nevada's All Districts Rule, which required initiative proponents to obtain signatures equal to 10% of the votes cast in the previous general election *in each of the state's federal Congressional districts* to qualify for the ballot, was facially unconstitutional under the First Amendment. 673 F.3d at 1126-27. However, instead of employing *Anderson-Burdick*, the *Angle* court opted for a slightly different approach, acknowledging that there existed "no First Amendment right to place an initiative on the ballot," and thus, "[r]egulations that make it more difficult to qualify an initiative for the ballot . . . do not *necessarily* place a *direct* burden on First Amendment rights." *Id.* at 1133 (emphasis added). At the same time, the panel recognized that ballot access restrictions "may indirectly impact core political speech" and thus "reduc[e] the quantum of speech on a public issue." *Id.* (quoting *Meyer*, 486 U.S. at 423).

To resolve this paradox, the *Angle* court offered the following solution: "we *assume* that ballot access restrictions place a severe burden on core political speech, and trigger strict scrutiny, *when* they significantly inhibit the ability of initiative proponents to place initiatives on the ballot." *Id.* (emphasis added). The panel likened this standard to the one used to evaluate restrictions on a potential candidate's access to the ballot: the "burden on plaintiffs' rights should be measured by whether, in light of the entire statutory scheme regulating ballot access,

'reasonably diligent' candidates can normally gain a place on the ballot, or whether they will rarely succeed in doing so." *Id.* (quoting *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008)). The *Angle* panel also identified two scenarios "in which restrictions . . . can severely burden core political speech": (1) "regulations can restrict one-on-one communication between petition circulators and voters," and (2) "regulations can make it less likely that proponents will be able to garner the signatures necessary to place an initiative on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Id.* at 1132 (citations and quotation marks omitted). Using this test, the court found that neither scenario applied to the *Angle* plaintiffs, and applied rational basis review in the absence of a "severe burden" on core political speech. *Id.* at 1134-35.

The state disputes that *Angle* is appropriate here, but neither of its justifications for deviating from the framework are particularly persuasive. The state suggests that the *Angle* standard should be limited to the context of initiative petitions, and not applied to laws regulating recall petitions, because (1) "there is no right to recall under the federal Constitution" and (2) applying similar standards to "qualify for the ballot at a regularly scheduled election and to trigger a recall is nonsensical." State Mot. 19-20, ECF 21. But the first reason is not unique to recall petitions: there is also no explicit "First Amendment right to place an initiative on the ballot." *Angle*, 673 F.3d at 1133. As for the second reason, while the state may disparage *Angle*'s application to the recall context as "nonsensical," courts have found that the *Angle* framework "is most analogous" to recall petition challenges. *Fight for Nevada v. Cegavske*, 460 F. Supp. 3d 1049, 1057 (D. Nev. 2020).

The state also characterizes the *Angle* framework as "dicta" and a "hypothesized standard" that has never been affirmed by the Ninth Circuit or any other court. State Reply 18,

ECF 27; State Mot. 18-19, ECF 21. Central to the state's argument is the *Angle* panel's phrasing of the standard: "we *assume* that ballot access restrictions place a severe burden on core political speech, and trigger strict scrutiny, *when* they significantly inhibit the ability of initiative proponents to place initiatives on the ballot." 673 F.3d at 1133 (emphasis added). The state seizes upon the "assume" term and argues that everything that follows, including the framework itself, is simply an analytical exercise based on a hypothetical assumption. But it is fairly easy to read the phrasing in *Angle* as a conditional standard: if a plaintiff shows that a ballot access restriction significantly inhibits the ability of proponents to qualify for the ballot (i.e, by showing a substantial burden), then strict scrutiny applies; otherwise, as was the case in *Angle*, rational basis review is employed. *Id.* at 1134-35.

Crucially, other courts—the Supreme Court among them—have recognized *Angle* as the standard of review for ballot access litigation in the Ninth Circuit. To be sure, as the state notes, these courts have signaled that the *Angle* framework is on shaky ground. For example, in his concurrence to the Supreme Court's granting of a stay in *Little v. Reclaim Idaho*, Chief Justice Roberts (joined by three other sitting justices) suggested "there is a fair prospect that the Court will set aside the District Court order" that applied *Angle*, noting that "[e]ven assuming that the state laws at issue implicate the First Amendment, such reasonable, nondiscretionary restrictions are almost certainly justified by the important regulatory interests in combating fraud and ensuring that ballots are not cluttered with initiatives that have not demonstrated sufficient grassroots support." 140 S. Ct. 2616, 2617 (2020) (Roberts, C.J., concurring). The Chief Justice observed that at least three circuits have adopted a different approach from *Angle* and "have held that regulations that may make the initiative process more challenging do not implicate the First Amendment so long as the State does not restrict political discussion or petition circulation." *Id.*

at 2616 (collecting cases from the Seventh, Eighth, and Tenth Circuits). However, in the very same paragraph, the Chief Justice also recognized that the position espoused in *Angle*—that "the First Amendment requires scrutiny of the interests of the State whenever a neutral, political regulation inhibits a person's ability to place an initiative on the ballot," *is* the standard in the Sixth and Ninth Circuits. *Id.* ("Yet the Circuits diverge in fundamental respects . . . [a]ccording to the Sixth and Ninth Circuits . . ."). And while Chief Justice Roberts recognized that the Supreme "Court is reasonably likely to grant certiorari to resolve the split" in the future, *Angle* remains the recognized framework that this court, which is bound by Ninth Circuit caselaw, must follow absent instruction to the contrary.

**B. Analysis**

As a reminder, the *Angle* panel outlined a two-pronged path for evaluating whether a state's ballot regulations survive constitutional muster. On the one hand, "election 'regulations imposing *severe burdens* on plaintiffs' rights must be narrowly tailored and advance a compelling state interest.'" *Angle*, 673 F.3d at 1132 (emphasis in original) (quoting *Prete*, 438 F.3d at 961). On the other hand, "[*l*]*esser burdens* . . . trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* The *Angle* court then identified "two ways in which restrictions . . . can severely burden core political speech": (1) those that "restrict one-on-one communication between petition circulators and voters," and (2) those that "make it less likely that proponents will be able to garner the signatures necessary to place an initiative on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Id.* (citations and quotation marks omitted).

Plaintiff Gonzales' facial challenge fails to demonstrate a severe burden on a First Amendment right under either scenario.[13] First, O.R.S. § 249.875 places no restriction on a petitioner's ability to communicate, one-on-one, with potential voters. *See Meyer*, 486 U.S. at 424 (invaliding a Colorado statute that barred payment for petition circulators because the law "restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse[:] direct one-on-one communication"); *Reclaim Idaho v. Little*, 469 F. Supp. 3d 988, 999 (D. Idaho 2020), *enforcement granted in part, denied in part*, No. 1:20-CV-00268-BLW, 2020 WL 6559401 (D. Idaho June 30, 2020) (finding that the first *Angle* scenario did not apply to Idaho's initiative restrictions because "the management of the spread of COVID-19," not the statutory restrictions themselves, had "foreclosed in-person one-on-one communication between [plaintiff's] petition circulator volunteers and voters.").

Second, plaintiffs' submissions fail to demonstrate that O.R.S. § 249.875 imposes a severe burden such that proponents will not "be able to garner the signatures necessary to place an initiative on the ballot." *Angle*, 673 F.3d at 1132. The Ninth Circuit has advised that when analyzing this scenario, "the burden on plaintiffs' rights should be measured by whether, in light of the entire statutory scheme regulating ballot access, reasonably diligent candidates can normally gain a place on the ballot, or whether they will rarely succeed in doing so." *Id.* at 1133 (quotation marks omitted) (quoting *Nader*, 531 F.3d at 1035). And to be sure, plaintiff represents, *ipse dixit*, that even without a pandemic or wildfires, "the 90-day deadline is so short, so unrealistic, and so burdens the recall power, that it impermissibly infringes on the peoples' right to recall their elected officials." Second Am. Compl. ¶ 4, ECF 42. But the factual

[13] As a reminder, only plaintiff Gonzales' facial challenge (and not any as-applied challenges) is relevant here because it is the only claim that qualifies for the "capable of repetition, yet evading review" exception to mootness.

submissions that underpin plaintiffs' suit paint the exact *opposite* picture: in a letter to Riggs, plaintiffs declared that "there is *little doubt* that, during non-COVID-19 times, the campaign could *easily* obtain *well over* 2,400 valid signatures during the statutory 90-day signature gathering period." Second Am. Compl., Ex. 4 at 2, ECF 42-4 (emphasis added). Otherwise said, plaintiffs have not pleaded the requisite facts to show that "reasonably diligent" petitioners cannot "normally" qualify for a recall election.[14] *Angle*, 673 F.3d at 1133 (quotation marks omitted) (quoting *Nader*, 531 F.3d at 1035); *see also id.* at 1134 ("The plaintiffs have presented only speculation, without supporting evidence, that the [statute] imposes a severe burden on the First Amendment rights of initiative proponents."); *Fight for Nevada*, 460 F. Supp. 3d at 1058 (finding that on a factual level, the plaintiff had not "met its showing to demonstrate that the signature requirements of [Nevada laws and directives] impose[d] a severe burden on core political speech.").

Without a demonstrated "severe burden" on First Amendment rights, the analysis shifts to "less exacting review," where "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* at 1132. First, Oregon undeniably has an important regulatory interest in making sure that a recall petition "has sufficient grass roots support to be placed on the ballot." *Meyer*, 486 U.S. at 425-26; *see also Reclaim Idaho*, 140 S. Ct. at 2617 (Roberts, C.J., concurring) ("[E]ven assuming that [] state laws [] implicate the First Amendment, such reasonable, nondiscretionary restrictions are almost certainly justified by the

[14] It is for this reason (a failure to demonstrate a severe burden) that if, somehow, the *Anderson-Burdick* test was employed instead of the *Angle* framework, plaintiffs' challenge would still fail. Under the sliding-scale test, "a law imposing a minimal burden need only reasonably advance important interests." *Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019) (citations and quotation marks omitted). And as discussed below, O.R.S. § 249.875 easily passes muster under this rational basis review standard.

important regulatory interests in combatting fraud and ensuring that ballot are not cluttered with initiatives."). And second, the First Amendment permits states "considerable leeway" in regulating the electoral process, provided their choices do not produce "undue hindrances to political conversations and the exchange of ideas." *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 191-92 (1999).

Guidance from the Oregon Attorney General's Office indicates that O.R.S. § 249.875 "was designed to prevent" abuse of the recall power. 37 Op. Atty Gen. Ore. 1399, 1402 (1972). Specifically:

> It is possible that a recall petition, based upon good grounds or not, may be circulated, and then when completed or nearly completed, be put in "cold storage" to await a more convenient opportunity for a sudden assault upon the officer involved. And, whether or not the petitions were originally circulated with this end in view, there are cases in which the uncertainty of the officer's position has been thus continued for a considerable period of time. A plan of securing petitions and holding them indefinitely, to be filed at the whim of a few wire pullers, is absurd. Such a program could be employed to bully and control officials. No little group of men should be permitted to hold such petitions in their hands, to be used as a means of influencing affairs at the city hall. No more dangerous program could be introduced into municipal or other government.

*Id.* (quoting J.D. BARNETT, OPERATION OF INITIATIVE, REFERENDUM AND RECALL IN OREGON 211 (1915). And a state's "interest in preserving the integrity of the electoral process is undoubtedly important." *John Doe No. 1*, 561 U.S. at 197. Indeed, "[s]tates enjoy considerable leeway to choose the subjects that are eligible for placement on the ballot and to specify the requirements for obtaining ballot access (*e.g.*, the number of signatures required, *the time for submission*, and the method of verification). *Id.* at 212 (Sotomayor, J., concurring) (quotation marks omitted) (emphasis added). Simply put, "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788. The development and enaction of O.R.S. § 249.875 encompasses just that; accordingly,

defendant's enforcement of the statute does not violate the First Amendment, and plaintiff Gonzales' remaining facial challenge fails.

**RECOMMENDATIONS**

The state and defendant's respective motions to dismiss (ECF 21, 23) should be GRANTED. Specifically, plaintiffs' state law claims should be dismissed because they are either moot or the *Pennhurst* doctrine applies, preventing this federal court from conferring any form of relief. Plaintiffs' claims under federal law should be dismissed because they are either moot or fail to demonstrate a First Amendment violation under relevant caselaw. Additionally, plaintiffs' motion for certification of a question to the Oregon Supreme Court (ECF 43) should be DENIED.

**SCHEDULING ORDER**

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due Friday, September 09, 2022. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

//

//

//

//

//

//

**NOTICE**

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED August 25, 2022.

/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge