JESSE A. BUSS, OSB # 122919
WILLAMETTE LAW GROUP, PC
411 Fifth Street
Oregon City OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

Attorney for Plaintiffs
COMMITTEE TO RECALL DAN HOLLADAY,
JEANA GONZALES, and ADAM MARL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

|  |  |
|---|---|
| **COMMITTEE TO RECALL DAN HOLLADAY, JEANA GONZALES,** and **ADAM MARL,** | Case No. 3:20-cv-01631-YY |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (THIRD AMENDED)** |
| vs. | |
| **JAKOB WILEY**, City Recorder for Oregon City, in his official capacity, | |
| Defendant, | |
| and | |
| **STATE OF OREGON**, | |
| Intervenor-Defendant. | |

**OVERVIEW OF CASE**

1.      Plaintiffs bring this action to challenge Oregon's statutory 90-day signature gathering deadline—contained in ORS 249.875(1)—as inconsistent with Article II, section 18, of the Oregon Constitution and, by extension, the First and Fourteenth Amendments to the U.S. Constitution.

2.      Article II, section 18, of the Oregon Constitution creates the recall power, which allows voters to remove any public elected official from office via special election. To qualify for the ballot under section 18, recall proponents must file a prospective recall petition and obtain the signatures of 15% of the number of district electors who voted in the most recent four-year gubernatorial election.

3.      The Oregon Constitution contains no deadline for the gathering of recall petition signatures, and does not authorize the Oregon Legislature to adopt such a deadline. Therefore, ORS 249.875(1), which purports to impose a 90-day signature gathering deadline for all recall petitions, is void as inconsistent with Article II, section 18, of the Oregon Constitution.[1]

4.      If the 90-day limitation under ORS 249.875(1) violates the Oregon Constitution, then it also violates the First Amendment (as made applicable to the states through the Fourteenth Amendment). It is settled law that the circulation of a recall petition under Article II, section 18, of the Oregon Constitution is "core political speech"—an area of public policy where First Amendment protection of robust discussion is at its zenith. After 90 days ORS 249.875(1) effectively bans recall petition circulation, necessarily restricting one-on-one communication

---

[1]      Regulations implementing ORS 249.875(1) contain the same 90-day deadline. *See*, *e.g.*, OAR 165-014-0005(2) (designating 2020 Recall Manual); 2020 Recall Manual at 4, 6, 10 (90-day limitation on signature gathering). Whenever plaintiffs herein challenge the 90-day deadline contained in ORS 249.875(1), they also challenge the 90-day limitation contained in the Recall Manual, as amended.

PAGE 2 OF 18 - COMPLAINT - DECLARATORY AND INJUNCTIVE RELIEF (3rd Amended)

between petition circulators and voters *where the Oregon Constitution permits it*. The statute therefore imposes a severe burden on core political speech, triggering strict scrutiny. Because Oregon does not have a compelling interest in violating its own constitution, ORS 249.875(1) violates the First Amendment.

5.      In 2020 Plaintiffs filed a recall petition against Mayor Dan Holladay, and the City of Oregon City enforced the statutory 90-day petition circulation limitation. In doing so, the City violated Plaintiffs' rights under Article II, section 18, of the Oregon Constitution and, by extension, their rights under the First and Fourteenth Amendments.

6.      To preserve and defend the peoples' recall right, Plaintiffs seek declaratory and injunctive relief declaring ORS 249.875(1) unconstitutional and enjoining the City and the State of Oregon from imposing 90-day recall petition circulation deadlines in reliance upon it. Plaintiffs also seek nominal monetary damages for the completed injury to their First and Fourteenth Amendment rights.

**PARTIES**

7.      Plaintiff **COMMITTEE TO RECALL DAN HOLLADAY** is a recall petition committee formed under ORS 260.118 to support Petition 2020-01, the prospective recall petition filed by Jeana Gonzales to initiate the recall election process against Oregon City Mayor Dan Holladay.

8.      Plaintiff **JEANA GONZALES** is an Oregon City elector and was the chief petitioner of Oregon City Petition 2020-01. A civically active resident, Ms. Gonzales is the co-founder of Unite Oregon City, a grass-roots community non-profit with the following mission statement:

"Unite Oregon City is an active non-partisan volunteer group working to create an inclusive community where all voices are heard and respected. Our mission is to promote equity and acceptance within the community of Oregon City and surrounding areas, rejecting prejudice based on, but not limited to, ethnicity, cultural background, age, gender identity, sexuality, socioeconomic status, disability, citizenship status, spiritual faiths, skin color and country of origin."

Ms. Gonzales also intends to participate in future recall petition campaigns in Oregon at the local, county, regional, and state levels. At the local level (i.e. Oregon City), Ms. Gonzales intends to file another recall petition soon after this litigation is concluded. Ms. Gonzales will participate in county, regional, and state-level recall campaigns if and when she believes an elected official at those levels should be recalled.

9.      Plaintiff **ADAM MARL** is an Oregon City voter and elected City Commissioner for the City of Oregon City. He was the campaign manager for the Committee to Recall Dan Holladay. Active in politics since he was 15 years old, Mr. Marl served as the campaign manager for Jeff Gudman, the 2020 Republican candidate for Oregon State Treasurer, and was employed by the Ron Noble for Congress campaign. Mr. Marl graduated from Willamette University with a B.A. in Politics, Policy, Law, and Ethics, along with a minor in Civic Communication and Media. Mr. Marl's professional plans include political campaign management, political consulting, and related work. In both his personal and professional capacities, Mr. Marl intends to participate in future recall petition campaigns in Oregon at the local, county, regional, and state levels.

10.      Defendant **JAKOB WILEY** is the City Recorder for the City of Oregon City. His predecessor in office, Kattie Riggs, was the recall election filing officer for Petition 2020-01. ORS 249.865 *et seq.*; OAR 165-014-0110(2)(a). In that capacity Ms. Riggs was the responsible elections officer under Article II, section 18(6), of the Oregon Constitution, which reads: "The recall petition shall be filed with the officer with whom a petition for nomination to such office

PAGE 4 OF 18 - COMPLAINT - DECLARATORY AND INJUNCTIVE RELIEF (3rd Amended)

should be filed, and the same officer shall order the special election when it is required." Mr. Wiley, whose name has been substituted for Ms. Riggs' as the responsible City official, is named only in his official capacity. Mr. Wiley, Ms. Riggs, and the City of Oregon City are collectively referred to below as "the City."

11.    The **STATE OF OREGON** ("the State") filed an unopposed motion to intervene (ECF No. 18) pursuant to 28 U.S.C. § 2403(b), which the Court has granted (ECF No. 30). Under that statute, upon being granted intervention the State has all the rights and obligations of a party defendant:

> "In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The State shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality."

*Id.* The State, through the Oregon Department of Justice, represents all State agencies, officers, and employees. Although this case involves an Oregon City municipal recall petition, the challenged statute (ORS 249.875(1)) is critical to recall efforts throughout Oregon. The State's participation as a full intervenor-defendant in this case is therefore appropriate.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over Plaintiffs' First and Fourteenth Amendment claims under 42 U.S.C § 1983 pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights jurisdiction), 2201 (declaratory relief), 2202 (injunctive relief). This Court has

supplemental jurisdiction over Plaintiffs' Oregon state law claims made herein pursuant to 28 U.S.C. § 1367. *See also Lane v. Wilson*, 307 U.S. 268, 274-75 (1939). Plaintiffs have exhausted any available administrative remedies.

13.     This Court has personal jurisdiction over the City because it is a municipal government operating in Clackamas County in the State of Oregon. Further, Mr. Wiley resides and maintains his office in the State of Oregon.

14.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(b) because all parties reside or have their principal offices located in Oregon, and the events or omissions giving rise to the claims occurred and will continue to occur in Oregon.

15.     This case is properly filed in Portland, Oregon and is properly before the Portland Division of this District pursuant to Local Rule 3-2(b) because the City's office is located in Oregon City, Clackamas County, State of Oregon, and the events giving rise to this action took place in Oregon City.

**FACTS**

<u>**Overview**</u>

16.     On June 22, 2020, Plaintiffs filed with the City a prospective recall petition against Mayor Dan Holladay.

17.     The next day, on June 23, 2020, the City accepted the prospective petition and issued cover and signature sheets for use in signature gathering.

18.     At the time the City approved the prospective petition for signature gathering, it established a minimum threshold of 2,400 valid signatures to trigger a recall election. *See* Or. Const, Art. II, § 18(2) (default recall election threshold is signatures equal to 15% of the number

of electors who voted for Governor in the electoral district at the most recent election at which a candidate for Governor was elected to a full term).

19.    Relying on ORS 249.875(1), the City established a 90-day signature submission deadline of September 21, 2020.

20.    On August 14, 2020, Plaintiffs sent a letter to the City asking it to withdraw its September 21st deadline. The letter explained that the statutory 90-day signature gathering deadline violates Article II, section 18, of the Oregon Constitution.

21.    On August 20, 2020, the City responded in writing, refusing to withdraw its September 21st deadline.

### Signature-Gathering Efforts and the Impact of the 90-Day Deadline

22.    Plaintiffs' entire recall petition campaign effort and signature gathering strategy was shaped by the pressure and demands of the 90-day signature gathering deadline imposed by ORS 249.875(1). That effort and strategy was more expensive, more difficult, and more likely to fail than it would have been had it not been burdened by a 90-day signature gathering deadline.

23.    The 90-day signature gathering deadline made Plaintiffs' recall petition campaign more *expensive* than it would have been without that deadline. For example, to gather enough signatures before the 90-day deadline expired, Plaintiffs hired a print and mail house, Gateway Communications, Inc. ("Gateway"), to print and mail recall petition signature sheets (and associated documents) directly to 11,210 voting households in Oregon City. That mailer packet included a cover letter, instructions, a signature sheet, and a return envelope. Gateway charged Plaintiffs $8,000 for this service, which Plaintiffs paid. That expense was, by far, the largest cost incurred by Plaintiffs during the recall campaign and raising funds for that expense on short

notice was a hardship to Plaintiffs. Also, to facilitate the return of completed signature sheets

from direct mail respondents, Plaintiffs paid hundreds of dollars to the United States Postal

Service (USPS) to set up and operate a business reply mail (BRM) account.

24.     But-for the 90-day deadline imposed by Ms. Riggs, Plaintiffs would not have sent

the direct mailer, nor hired Gateway, nor set up a BRM account. Indeed, but-for the 90-day

deadline, the mailer and BRM account would not have been necessary, and Plaintiffs would have

relied more heavily—perhaps exclusively—on traditional methods of signature gathering to

obtain the needed number of recall petition signatures. Because Plaintiffs did not hire paid

signature gatherers for their campaign, in-person signature gathering was a zero-cost approach

for Plaintiffs, but it would have taken more time than ORS 249.875(1) allowed.

25.     As noted above, the City approved the recall petition for signature-gathering on

June 23, 2020, and established a 90-day signature gathering deadline of September 21, 2020.

Those 90 days were wholly contained within the time period covered by Governor Brown's

COVID-19 emergency declaration. *See* Executive Order (EO) 20-24 (extending state of

emergency under EO 20-03 from May 7, 2020, through July 6, 2020); EO 20-30 at 3 (extending

state of emergency under EO 20-03 from July 6, 2020, through September 4, 2020); EO 20-38 at

3 (extending state of emergency under EO 20-03 from September 4, 2020, through November 3,

2020). During those 90 days, Clackamas County was subject to restrictions on outdoor social

gatherings, social distancing was required, and public fear of COVID-19 was pervasive. As a

result, large outdoor gatherings were virtually non-existent, and door-to-door canvassing for

petition signatures was, for all practical purposes, not a viable or responsible option. In other

words, while signature gathering campaigns have traditionally relied on large public gatherings

and door-to-door canvassing to engage potential signers, the restrictions and responsible safety

protocols associated with COVID-19 effectively took those options off the table for the recall

campaign. Therefore, from the campaign's start, the challenges associated with the COVID-19

pandemic were substantial.

26.     Before hiring Gateway to print and mail the signature sheet packets directly to

voting households in Oregon City, the campaign engaged in a variety of other signature-

gathering efforts. Because the COVID-19 pandemic was the backdrop for the entire recall effort,

the campaign largely relied on the following creative signature-gathering solutions:

- Online pre-registration for signing, with options to:

    o Schedule personal outdoor signing appointments; and
    o Have signature sheets delivered to a voter's home, or mailed/emailed to
      the voter.

- Outdoor drive-through signing stations;
- Web-based printable electronic signature sheets ("e-sheets");
- Socially distanced presence at the weekly Oregon City Farmers Market and the
  few other organized outdoor public events that complied with physical distancing
  requirements; and
- Intense volunteer recruitment to activate existing small networks (*e.g.* intra-
  household and neighbor-to-neighbor engagement).

27.     The recall campaign was an all-volunteer effort, and yet it was well-organized and

efficient. Before the campaign launched, the following volunteer leadership positions were filled:

Campaign Manager, Deputy Campaign Manager, Office Manager/Scheduler, Volunteer

Coordinator, Assistant Volunteer Coordinator, Field Director, Signature-Gathering Educator,

Signature-Gathering Coordinator, Phone Bank Lead, Constituency Organizer,

Communications/Press Secretary, Social Media Coordinator, Finance/Fundraising Director,

Technology Director/Website Manager, and Legal Counsel. Not long after the campaign

launched, more than 100 volunteers were engaged in the recall effort. Members of the leadership

team communicated and strategized daily and held weekly planning meetings. Collectively, campaign volunteers spent many hundreds of hours organizing, planning, and working to obtain petition signatures.

28.    30 days after receiving approval to circulate the signature sheets, the campaign had obtained approximately 1,340 raw signatures (43% of the campaign's goal of 3,100 raw signatures[2]). By day 45, that total had risen to approximately 1,613 raw signatures (52% of the campaign's goal). By day 60, the total had risen to approximately 1,961 raw signatures (63% of the campaign's goal). *At that rate, the campaign was not on track to obtain enough raw signatures by the 90-day deadline.* Indeed, as time went on, it was getting more and more difficult for volunteers to obtain new signatures. It was clear to the campaign leadership that, despite the dedication, diligence, and persistence of its many volunteers, a new, expensive approach would be needed in order to obtain a sufficient number of raw signatures by the September 21st deadline. That approach was the $8,000 direct mailer through Gateway.

29.    The campaign made the decision to hire Gateway at or around the 45-day mark, but the mailer was not funded, designed, printed, and ready to mail until day 69 (August 31st), 21 days before the September 21st deadline. The mailers were delivered on September 2nd, 19 days before the deadline.

30.    The direct-mail approach worked well. Out of the 11,210 mailers sent out, approximately 646 recipients responded (a 5.8% return rate), and most of the respondents included completed signature sheets in their return envelopes. For each returned piece of business reply mail, the USPS charged the campaign $1.40, for a total cost of approximately

---

[2]    The goal of 3,100 raw signatures was 700 more than the required 2,400 verified signatures, to account for the typical signature invalidity rate of 20-25%.

$900. The signature sheets returned from the direct mailers contained over 1,000 additional raw signatures. By contrast, after the mailer was sent, only several hundred more additional signatures were gathered via traditional signature-gathering methods.[3]

31.     But-for the expensive direct mailer tactic, the campaign would not have gathered sufficient signatures within 90 days (i.e. before the September 21st deadline set by the City). However, but-for the 90-day deadline, the campaign would *not* have utilized the direct mailer tactic, and therefore would *not* have incurred the expense associated with the direct mailer.

32.     The 90-day signature gathering deadline made Plaintiffs' recall petition campaign more ***difficult*** for the same reasons that it made signature gathering more expensive. Further, it is a truism that it is more difficult to gather a certain number of signatures within 90 days than it is to gather that same number of signatures *without* a 90-day deadline. If the campaign had had more than 90 days to gather signatures—rather than having its core political speech cut off at that point—it would not have dominated the campaign volunteers' lives (including Gonzales' and Marl's lives) to the same extent and intensity. The 90-day deadline required many campaign volunteers to dedicate most, if not all, of their free time over a 90-day period to campaign efforts. That was a hardship to the volunteers and to the campaign because it required volunteers to ignore other important matters, both personal and professional, to their detriment. The level of focus, intensity, and time required of the volunteers by the 90-day limit therefore made the campaign more difficult than it otherwise would have been without the 90-day limit.

---

[3]     This low number of traditionally-gathered signatures in the final weeks of the 90-day period is due, in large part, to the 2020 wildfires. Fire-related evacuations began in Oregon City on September 8, 2020, and continued until September 17, 2020, just four days before the September 21st deadline established by Ms. Riggs.. Many Oregon City voters (and campaign volunteers) evacuated Oregon City during this time, substantially curtailing signature-gathering efforts and opportunities.

33.     The 90-day signature gathering deadline made Plaintiffs' recall petition campaign *more likely to fail* for the same reasons that it made signature gathering more expensive and more difficult (as described above). Further, it is obvious that a time limitation acts to decrease the likelihood that a recall effort will be successful; by definition, a time limitation means that such an effort will fail if it does not meet the time limitation.

## LEGAL FRAMEWORK
### The Recall Right (Or. Const., Art. II, § 18)

34.     Adopted via initiative in 1908, Oregon's recall right is contained in Article II, section 18, of the Oregon Constitution, which states in full as follows:

"(1) Every public officer in Oregon is subject, as herein provided, to recall by the electors of the state or of the electoral district from which the public officer is elected.

"(2) Fifteen per cent, but not more, of the number of electors who voted for Governor in the officer's electoral district at the most recent election at which a candidate for Governor was elected to a full term, may be required to file their petition demanding the officer's recall by the people.

"(3) They shall set forth in the petition the reasons for the demand.

"(4) If the public officer offers to resign, the resignation shall be accepted and take effect on the day it is offered, and the vacancy shall be filled as may be provided by law. If the public officer does not resign within five days after the petition is filed, a special election shall be ordered to be held within 35 days in the electoral district to determine whether the people will recall the officer.

"(5) On the ballot at the election shall be printed in not more than 200 words the reasons for demanding the recall of the officer as set forth in the recall petition, and, in not more than 200 words, the officer's justification of the officer's course in office. The officer shall continue to perform the duties of office until the result of the special election is officially declared. If an officer is recalled from any public office the vacancy shall be filled immediately in the manner provided by law for filling a vacancy in that office arising from any other cause.

"(6) The recall petition shall be filed with the officer with whom a petition for nomination to such office should be filed, and the same officer shall order the special election when it is required. No such petition shall be circulated against any officer until the officer has actually held the office six months, save and

except that it may be filed against a senator or representative in the legislative assembly at any time after five days from the beginning of the first session after the election of the senator or representative.

"(7) After one such petition and special election, no further recall petition shall be filed against the same officer during the term for which the officer was elected unless such further petitioners first pay into the public treasury which has paid such special election expenses, the whole amount of its expenses for the preceding special election.

"(8) Such additional legislation as may aid the operation of this section shall be provided by the legislative assembly, including provision for payment by the public treasury of the reasonable special election campaign expenses of such officer. But the words, "the legislative assembly shall provide," or any similar or equivalent words in this constitution or any amendment thereto, shall not be construed to grant to the legislative assembly any exclusive power of lawmaking nor in any way to limit the initiative and referendum powers reserved by the people."

35.    Article II, section 18 contains no time limitation on signature gathering.

36.    Nor does section 18 authorize the legislative assembly to establish a time limitation for signature gathering. Although subsection (8) authorizes the Oregon Legislature to enact statutes "as may aid the operation of this section," the Oregon Supreme Court has interpreted the word "aid" in section 18 to mean "to support, help, or assist." *State ex rel. Clark v. Harris*, 74 Or 573, 580 (1914). A statutory signature gathering time limitation does not "support, help, or assist" the operation of section 18. Instead, such a statutory time limit impermissibly curtails and burdens section 18's self-executing recall power. *See Harris,* 74 Or at 585 (section 18 is self-executing and requires no implementing legislation).

37.    Subsection 18(2) imposes a ceiling on how many signatures recall petitioners may be required to file in order to trigger a special recall election. That maximum threshold is 15% of the number of electors who voted for Governor in the electoral district at the most recent election at which a candidate for Governor was elected to a full term. *Id.* Section 18 does not specify a minimum threshold for signatures.

38.    The Oregon Supreme Court has held that, in the absence of legislation or a municipal charter provision electing a lower percentage threshold for recalls, the maximum percentage threshold applies. *See Harris*, 74 Or at 579-80 (applying maximum percentage threshold of 25 percent under original version of Article II, section 18); *State ex rel. Postlethwait v. Clark*, 143 Or 482, 488 (1933) (looking first to the charter of the City of Baker in evaluating applicable recall procedure). Therefore, in the absence of an applicable local or statewide downward election, the default signature threshold for recalls is 15%. The Oregon Legislature has elected the 15% maximum, *see* ORS 249.870, while Oregon City has not made an affirmative election, and therefore defaults to the 15% threshold.

### The Statutory 90-Day Limitation - ORS 249.875(1)

39.    As part of the 1933 recall-related legislation, the legislative assembly adopted the 90-day signature gathering limitation as part of what became *former* O.C.L.A. 81-2202. That statute was renumbered as *former* ORS 254.420 in 1953, and became ORS 249.875(1) in 1979.

40.    The current statute, ORS 249.875(1), reads as follows:

"A recall petition shall be void unless completed and filed not later than the 100th day after filing the prospective petition described in ORS 249.865. **Not later than the 90th day after filing the prospective petition the petition shall be submitted to the filing officer** who shall verify the signatures not later than the 10th day after the submission. The filed petition shall contain only original signatures. A recall petition shall not be accepted for signature verification if it contains less than 100 percent of the required number of signatures. The petition shall not be accepted for filing until 100 percent of the required number of signatures of electors have been verified."

*Id.* (bolding added).

41.    No known Oregon trial court or appellate decision has ever addressed the constitutionality of the 90-day signature gathering limitation.

## FIRST & FOURTEENTH AMENDMENTS

42.     The First Amendment to the U.S. Constitution states as follows:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise therefore; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the government for a redress of grievances."

U.S. Const., Am. 1. The First Amendment is applicable to the states via the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652 (1925).

43.     Circulation of petitions is core protected speech under the First Amendment. *Prete v. Bradbury*, 438 F.3d 949, 961 (9th Cir. 2006); *see also Meyer v. Grant*, 486 U.S. 414, 420 (1988). If a severe burden on these rights is established—such as through restrictions on one-on-one communication between petition circulators and voters—then strict scrutiny applies. *See, e.g.*, *Angle v. Miller*, 673 F.3d 1122, 1132-33 (9th Cir. 2012).

## CLAIMS FOR RELIEF

### First Claim for Relief
### (Violations of Or. Const., Art. II, § 18 – Undue Burden on Recall Right)
### (ORS 28.010 *et seq* and ORS 246.910(1))

44.     Plaintiffs reallege and incorporate by reference all prior paragraphs into each of the counts set forth below.

### <u>COUNT ONE</u>

45.     The 90-day signature gathering limitation contained in ORS 249.875(1) does not "aid," unduly burdens, is not authorized by, and facially violates the recall right of Article II, section 18, of the Oregon Constitution, and is therefore void and unenforceable. Accordingly, the

September 21, 2020, signature gathering deadline imposed by the City violated Plaintiffs' recall rights under Article II, section 18, of the Oregon Constitution.

COUNT TWO

46.    Even if the 90-day limitation is not facially invalid under the Oregon Constitution, it is void as applied. Specifically, in light of the public health emergency created by the COVID-19 pandemic and the impacts of the September 2020 regional fires, smoke, and related evacuations, the 90-day signature gathering limitation contained in ORS 249.875(1) is void as applied under Article II, section 18, of the Oregon Constitution. Accordingly, the September 21, 2020, signature gathering deadline imposed by the City violated Plaintiffs' recall rights under Article II, section 18, of the Oregon Constitution.

**Second Claim for Relief**
**(Violations of 1st and 14th Amendments – Undue Burden on Ballot Access**
**and Rights to Freedom of Speech and Association)**
**(42 U.S.C. § 1983, 28 U.S.C. §§ 1331, 1343, 2201, and 2202)**

47.    Plaintiffs reallege and incorporate by reference all prior paragraphs into each of the counts set forth below.

COUNT ONE

48.    If the 90-day limitation contained in ORS 249.875(1) facially violates Article II, section 18, of the Oregon Constitution, then it must also be facially invalid under the First and Fourteenth Amendments. That is, by prohibiting one-on-one communication between petition circulators and voters after the expiration of the 90-day period, ORS 249.875(1) severely burdens core political speech protected by the Oregon Constitution. And because the State of Oregon does not have a compelling reason to violate its own constitution—specifically Article II, section

18—the 90-day limitation cannot withstand strict scrutiny under the First Amendment.

Accordingly, the September 21, 2020, signature gathering deadline imposed by the City violated

Plaintiffs' rights under the First and Fourteenth Amendments.

49.    Plaintiffs are entitled to nominal monetary damages of $1 under *Uzuegbunam v.*

*Preczewski*, 141 S. Ct. 792, 802 (2021).

<u>COUNT TWO</u>

50.    For the same reasons, if the 90-day limitation contained in ORS 249.875(1)

violates Article II, section 18, of the Oregon Constitution as applied, then it must also be void as

applied under the First Amendment.

51.    Plaintiffs are entitled to nominal monetary damages of $1 under *Uzuegbunam v.*

*Preczewski*, 141 S. Ct. 792, 802 (2021).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare the 90-day limitation on signature gathering contained in ORS 249.875(1)

facially void under Article II, section 18, of the Oregon Constitution;

B.    Declare the 90-day limitation on signature gathering contained in ORS 249.875(1)

void as applied under Article II, section 18, of the Oregon Constitution;

C.    Declare that the City's imposition of a September 21, 2020, signature-gathering

deadline under ORS 249.875(1) violated Plaintiffs' recall rights under Article II, section 18, of

the Oregon Constitution;

D.    Declare the 90-day limitation on signature gathering contained in ORS 249.875(1)

facially void under the First and Fourteenth Amendments;

E.      Declare the 90-day limitation on signature gathering contained in ORS 249.875(1) void as applied under the First and Fourteenth Amendments;

F.      Declare that the City's imposition of a September 21, 2020, signature-gathering deadline under ORS 249.875(1) violated Plaintiffs' rights under the First and Fourteenth Amendments, including but not limited to their rights to speech and political expression;

G.      Grant Plaintiffs nominal monetary damages in the amount of $1, under *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021);

H.      Issue prospective and permanent injunctive relief preventing the City and the State, and their agencies, officers, and employees, from enforcing or otherwise applying the 90-day limitation on signature gathering contained in ORS 249.875(1);

I.      Award Plaintiffs their reasonable costs, litigation expenses, and attorney fees associated with this litigation pursuant to 42 U.S.C. § 1988, ORS 183.497, and the public benefit doctrine under *Deras v. Myers*, 272 Or 47 (1975) and its progeny; and

J.      Grant such further relief as the Court deems just and proper.

Dated this 25th day of September 2025.

 /s/ Jesse A. Buss
Jesse A. Buss, OSB # 122919
WILLAMETTE LAW GROUP, PC
411 5th St.
Oregon City OR 97045
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

Attorney for Plaintiffs Committee to Recall
Dan Holladay, Jeana Gonzales, and Adam
Marl